## PETERSON, Respondent, vs. WIDULE, County Clerk, Appellant.

### *May 25—June 17, 1914.*

*Constitutional law: Regulation of marriage: Preventing transmission of disease: Construction of statutes: Classification: Statute applicable to males only: Examination of applicant for marriage license: "Recognized tests:" What included: Religious liberty: Due process of law: Trial by jury: Partial invalidity of statute.*

1. The state may control and regulate by reasonable laws the marriage relation, and may prevent the contracting of marriage by persons afflicted with loathsome or hereditary diseases which are liable to be transmitted to the spouse or inherited by the offspring.

2. A constitutional law enacted by the legislature establishes public policy on the subjects covered by it, and that policy is not open to question by the courts.

3. The courts must sustain a law unless its unconstitutionality is beyond reasonable doubt.

4. If a law is open to two constructions, one of which will condemn it and the other save it from condemnation and accomplish the legislative purpose, it must be given the latter construction.

5. A law directed against males only, for the purpose of preventing the transmission of venereal diseases, is based upon a valid classification and is not discriminatory.

6. Sec. 2339m, Stats. 1913, requires every male applicant for a marriage license to be examined as to the existence in him of *"any* venereal disease;" then makes unlawful the issuance of the license if he fails to present a physician's certificate that he is free from *"acquired* venereal diseases" (the word "acquired" having been inserted by an amendment to the bill as first introduced); and then prescribes the form of such certificate, which form contains the statement that the applicant is free from *"all* venereal diseases." *Held,* that the confusion in the language will not prevent the court from giving effect to the clear intent of the legislature that the law should cover only *acquired* venereal diseases as that term is understood in medical science, and that the form of the certificate is to be construed as covering only such diseases.

7. It must be presumed that in enacting said statute the legislature had a definite and certain end in view, that they did not intend to prohibit marriage, but intended rather to safeguard it by the use of practicable and reasonable means.

8. Within the meaning of sec. 2339m, Stats. 1913, "clinical tests" of a disease are those which may be observed by the bedside or upon the general examination of the patient, not depending upon the use of instruments, apparatus, or chemical examinations; and "laboratory tests" are those which call for proofs by means of instruments, apparatus, or chemical reactions.

9. In the provision of said sec. 2339m, Stats. 1913, requiring, as a prerequisite to the granting of the physician's certificate, physical examination and "the application of the recognized clinical and laboratory tests of scientific search," the words "recognized tests" are construed as referring to the tests recognized and used by the examiners empowered to make them, i. e. licensed physicians who are thirty years of age, and not to include a test—known as the Wassermann test—which, as the legislature is presumed to have known, is highly technical, difficult, and expensive, can be made by very few of the general practitioners of the state, and cannot be made for the statutory fee of $3.

10. Said statute does not interfere in any respect with religious liberty.

11. The provisions in said statute for a trial before the county judge, without a jury, in case of a refusal of the certificate of health, afford sufficient protection to the applicant and do not involve any denial of due process of law.

12. The fact that the fee of $3 fixed by the law for the examination is very meager is not a sufficient ground for holding the law unconstitutional.

13. If the penalties provided by sub. 6 of said sec. 2339m, Stats. 1913, are extreme, that fact does not invalidate the other parts of the statute, such penalties not being an indivisible portion of the law nor forming in any sense a compensation for the other clauses.

MARSHALL and VINJE, JJ., dissent.

APPEAL from a judgment of the circuit court for Milwaukee county: F. C. ESCHWEILER, Circuit Judge. *Reversed.*

*Mandamus* action. The petitioner applied to the defendant as county clerk for a marriage license, and received a blank form of certificate, such as is required by sec. 2339m,

Stats. He presented himself to four physicians for exami-
nation to determine whether he had a venereal disease, ten-
dering each of them the statutory fee of $3. Each physician
refused to make the examination because such fee was insuf-
ficient compensation for making the Wassermann test for
syphilis, which the physicians considered as necessary to be
made before they could make the certificate. The petitioner
thereupon renewed his application for a marriage license
without a certificate, but was refused, and brought this action
to compel the issuance of a license. Return was made to the
alternative writ to the effect that the petitioner had not pro-
duced the required certificate. Testimony of ten physicians
was taken, and the court made the following findings of fact
and conclusions of law:

"1. That in medical science there are three diseases desig-
nated under the one head of venereal diseases, viz.: syphilis,
gonorrhea, and chancroid;

"2. That the term 'hereditary' refers to such a disease re-
ceived by the individual at the time of, or prior to birth;

"3. That 'acquired' is restricted to such a disease starting
in the individual after birth;

"4. That 'clinical' refers to what may be discovered by the
observation of the physician from the body of the individual
and without the use of instruments;

"5. That 'laboratory tests' are those requiring the use of
instruments and certain methods of demonstrating the pres-
ence or absence of such diseases.

"6. That among such laboratory tests is the one known as
the 'Wassermann test;' that it has been known to the medical
world about seven years; is a standard, well recognized and
very efficient test, and a great many of such tests are being
made by those familiar with the use thereof; that it will de-
termine with practical certainty in from seventy to ninety
per cent. of the cases tested, the existence of syphilis, and
that it is necessary and proper in many cases where there are
some clinical evidences.

"7. That a male person over eighteen years of age might
be possessed of syphilis in a form transmissible to his wife

or offspring without such condition being discovered by a 'clinical' test.

"8. That in the event last mentioned the Wassermann test is efficient, practical and necessary in order to determine as nearly as can be the presence or absence of venereal diseases.

"9. That the Wassermann test requires a special laboratory apparatus and equipment.

"10. That there are now, out of the over 3,000 physicians in the state of Wisconsin, not to exceed twenty-five, and among the over 300 in Milwaukee county not to exceed six, who are equipped and prepared for the Wassermann test.

"11. That the maximum fee of $3 prescribed in the chapter that a physician may charge and receive for such examination and certificate is unreasonably small for the making of the Wassermann test. This finding having been conceded by the counsel for the state and defendant, upon the trial.

"And as conclusion of law:

"That ch. 738 of the Laws of 1913, entitled 'An act to create section 2339m of the Statutes, relating to marriage and venereal diseases,' is an unreasonable and material impairment of the inalienable right of fit and proper persons to enter into the marriage state and that it is in violation of the rights secured by section 1, article I, and section 18, article I, of the constitution of the state of Wisconsin and therefore void, and no defense to the defendant in his refusal to grant petitioner a marriage license, and that the petitioner is entitled to the peremptory writ of *mandamus,* as prayed in the petition, and judgment is ordered accordingly."

From this judgment the county clerk appeals.

Sec. 2339m, Stats., is as follows:

"1. All male persons making application for license to marry shall at any time within fifteen days prior to such application, be examined as to the existence or nonexistence in such person of any venereal disease, and it shall be unlawful for the county clerk of any county to issue a license to marry to any person who fails to present and file with such county clerk a certificate setting forth that such person is free from acquired venereal diseases so nearly as can be determined by physical examination and by the application of the recognized clinical and laboratory tests of scientific search. Such

certificate shall be made by a licensed physician, shall be filed with the application for license to marry, and shall read as follows, to wit:

"I, .... .... (name of physician), being a legally licensed physician, do certify that I have this .... day of ..., 19.., carefully and thoroughly examined .... .... (name of person), having applied the recognized clinical and laboratory tests of scientific search and find him to be free from all venereal diseases so nearly as can be determined.

"........

"(Signature of physician)

"2. Such examiners shall be physicians duly licensed to practice in this state, shall be persons of good moral character and of scientific attainments and at least thirty years of age. The fee for such examination, to be paid by the applicant for examination before the certificate shall be granted, shall not exceed three dollars. The county physician of any county shall, upon request, make the necessary examination and issue such certificate, if the same can properly be issued, without charge to the applicant, if said applicant be indigent.

"3. Whenever there is a dispute or disagreement regarding the findings of any medical examiner, laboratory tests shall be made in the state laboratory of hygiene from material submitted by such examiner, and the findings of said laboratory shall be accepted as evidence of the presence or absence in the person examined of any venereal disease.

"4. In any case wherein the certificate of health required by subsection 1 of this section shall be refused and the applicant shall make and file with the county clerk of the proper county an affidavit setting forth the fact that such applicant has not had a fair and impartial examination and that he is entitled to such certificate of health, it shall be the duty of such county clerk to certify such proceedings, at once, to the county court of such county without formality or expense to such applicant. Such application shall be heard by a judge of said court, at the earliest time practicable, without a jury in court or in chambers, during the term or in vacation as the case may be. Notice of the time and place of such hearing shall be given to such applicant by mail. A certified copy of an order of such judge upon his findings in such matter determining that such applicant is entitled to such certificate

of health presented and filed with such county clerk, shall have the same force and effect as such certificate and such county clerk shall thereupon issue a license to marry, to such applicant.

"5. Any person a resident of this state, who with intent to evade the provisions of this act shall go into another state and there have a marriage solemnized and who within one year from date of such marriage shall return and reside in this state, shall upon information or knowledge to the district attorney of any county be required by him to file with the county clerk of any county in which such person may be then a resident, a certificate of examination from such physician as set forth in this section. Any person violating the provisions of this subsection shall be punished by imprisonment in the county jail not less than thirty days nor more than one year.

"6. Any county clerk who shall unlawfully issue a license to marry to any person who fails to present and file the certificate provided by subsection 1 of this section, or any party or parties having knowledge of any matter relating or pertaining to the examination of any applicant for license to marry, who shall disclose the same, or any portion thereof, except as may be required by law, shall upon proof thereof be guilty of a felony, and shall be punished by imprisonment in the state prison not less than one year nor more than five years.

"7. Any physician who shall knowingly and wilfully make any false statement in the certificate provided for in subsection 1 of this section shall be guilty of perjury and upon conviction shall be punished as for perjury, and a conviction under this subsection shall revoke the license of such physician to practice in this state."

For the appellant there was a brief by *Edw. C. Yockey,* district attorney, *Henry S. Sloan,* assistant district attorney, as attorneys, and the *Attorney General* and *Byron H. Stebbins,* assistant attorney general, of counsel, and oral argument by the *Attorney General, Mr. Stebbins,* and *Mr. Sloan.*

For the respondent there was a brief by *Runkel, Runge & McLogan,* and oral argument by *Carl Runge* and *J. M. McLogan.*

WINSLOW, C. J.   The case presents simply the question whether the so-called eugenics law is constitutional.   It was held unconstitutional by the trial court because (1) it is an unreasonable restriction upon the inalienable right of marriage; (2) it impairs the inherent right to enjoy life, liberty, and the pursuit of happiness; (3) it interferes with religious freedom.

Before taking up for discussion the specific objections to the law, some general, fundamental propositions, which are not open to question, may profitably be stated.

The power of the state to control and regulate by reasonable laws the marriage relation, and to prevent the contracting of marriage by persons afflicted with loathsome or hereditary diseases, which are liable either to be transmitted to the spouse or inherited by the offspring, or both, must on principle be regarded as undeniable.   To state this proposition is to establish it.   Society has a right to protect itself from extinction and its members from a fate worse than death. If authority be needed to support this proposition, reference may be made to Freund on Police Power, § 124, and cases there cited.

When the legislature passes a constitutional law, that law establishes public policy upon the subjects covered by it, and that policy is not open to question by the courts.

The courts must sustain a law unless its unconstitutionality be beyond reasonable doubt.   If the law be ambiguous or open to two constructions, that construction which will save it from condemnation and accomplish the legislative purpose is always to be adopted in preference to a construction which makes it unconstitutional.

Neither the legislative idea nor the legislative purpose in the passage of the present law can be a matter of serious doubt.   The *idea* plainly was that the transmission of the so-called venereal diseases by newly married men to their innocent wives was a tremendous evil, and the *purpose* just as plainly was to remedy that evil so far as possible by prevent-

ing the marriage of men who upon examination were found to possess such diseases.

An argument is made that the law is void because the classification is unreasonable, arbitrary, and discriminatory, in that it singles out men about to marry and makes a class of them, there being, as it is argued, no substantial differences which suggest the propriety of different legislative treatment between men who are about to marry and women who are about to marry. Theoretically the argument is strong. Women who marry and transmit a loathsome disease to their husbands do just as much harm as men who transmit such a disease to their wives. If women were in fact doing this thing as frequently or anywhere nearly as frequently as men the argument could hardly be met. The medical evidence in the case, however, corroborates what we suppose to be common knowledge, namely, that the great majority of women who marry are pure, while a considerable percentage of men have had illicit sexual relations before marriage, and consequently that the number of cases where newly married men transmit a venereal disease to their wives is vastly greater than the number of cases where women transmit the disease to their newly married husbands. Classification is not to be condemned because there may be occasional instances in which it does not fit the situation; it is proper if the great mass of situations to which the law applies justify the formation of a class and the application of some special or different legislative provisions to that class. Classification can rarely be mathematically exact. The question is not whether in some individual instance there is any perceptible distinction, but "whether there are characteristics which in a greater degree persist through the one class than in the other," and which justify the different treatment. *State v. Evans,* 130 Wis. 381, 110 N. W. 241. That there are such characteristics in the class of unmarried men is as certainly true as it is discreditable to the male sex.

It follows that legislation directed against males alone for the purpose of preventing the transmission of venereal diseases is clearly within the police power and just as clearly is not discriminatory. The only question to be considered is whether the law which attempts to accomplish the purpose is unreasonable or unduly invades constitutional rights in its methods of enforcement.

In considering this question it will be profitable in the beginning to determine what diseases the law covers. It will be noticed that the first subsection requires the prospective husband, within fifteen days previous to his application for license to marry, to be examined as to the existence in him of *"any* venereal disease." The law then makes it unlawful for the county clerk to issue a marriage license to such person if he fails to present a certificate setting forth that he is free from *"acquired* venereal diseases," and then prescribes the form of such certificate, which form contains the statement that the applicant is free from *"all* venereal diseases."

This seems quite confusing. According to the medical testimony and the dictionaries, there are three separate diseases (which, however, may coexist) generally known as "venereal diseases," viz. gonorrhea, chancroid (or local contagious ulcers), and syphilis. While some of the physicians say that syphilis is not a venereal disease in the scientific sense, especially when it is inherited or affects parts of the body other than the sexual organs, it seems to be quite well agreed that it is a venereal disease in the generally accepted use of that term, and hence is included within the provisions of the law in question. There is a distinct form of syphilis, however, termed inherited, which is or may be present in the children of syphilitic parents, and so it is true that there are in fact two well recognized forms of syphilis, *i. e.* the acquired and the inherited, the acquired being understood in medicine as that form which "is obtained otherwise than by inheritance or during the process of birth." This distinction

throws considerable light on the meaning of the law. The word "acquired" has, it seems, a meaning in medical science. Possibly it is not a technical word within the meaning of sub. 1 of sec. 4971, Stats., but certainly when it is deliberately used in a statute which deals with medical subjects it would seem that it must carry its accepted meaning in medical science. This conclusion becomes more satisfactory when the history of the law is examined. As first introduced in the senate (Bill No. 611 S.) it did not contain the word "acquired," but provided that the applicant must obtain and present to the county clerk a certificate that he is free from venereal diseases. In substance the first section then provided that an applicant for a marriage license must first be examined as to the existence or nonexistence of any venereal disease, obtain a certificate that such person is free from "venereal diseases as near as," etc., and that the form of the certificate must contain the words "free from all venereal diseases so nearly as can be determined." The bill received several amendments in the senate, among which was an amendment inserting the word "acquired." It would be idle to argue that this amendment was unimportant or immaterial. It must have had a serious and definite purpose. It unquestionably meant to eliminate from the operation of the act all forms of venereal diseases which were inherited and limit the examination and the certificate to those which were acquired.

The fact that the wording of the certificate was not changed at the same time is unfortunate, but not necessarily fatal to the legislative purpose. When, as here, that purpose is made clear by the history of the bill, confusion and even contradiction in language will not hinder the court from giving effect to that purpose. We deem it clear that the act as passed was intended to cover only acquired venereal diseases as understood in medical science, and that the form of physician's certificate in the act is to be construed as covering only such diseases.

The principal objection made to the act and the objection which the circuit judge found to be fatal is the objection that it requires in every case the use of a very delicate and expensive blood test, known as the Wassermann test, before the certificate required can be signed.   It is claimed, and rightly. claimed, under the evidence that this test is a highly technical test, requiring special training and the use of complex laboratory equipment not possessed by more than twenty-five practitioners in the state; that no physician could make such a test for the statutory fee of $3 or anywhere near that sum, on account of the time, technical knowledge, and equipment required; and that to require a physician to make the test for that fee would be an unreasonable requirement.   All this was substantially conceded by the state in the present case, and the concession seems to have been advisedly made.   If the law in fact requires the Wassermann test to be made in case of every applicant for a marriage license, the argument is very strong that it requires the absolutely unreasonable. But does it require that test?   The very facts relied on by the petitioner tending to show the technical, delicate, and expensive character of the test and that the great body of the practitioners of the state cannot make it, raises a more or less robust doubt as to the legislative intent to require the use of that test.   The more difficult and expensive that test is shown to be, the more serious becomes the doubt.   Now it must of course be assumed that the legislature had general knowledge of the delicacy, difficulty, and expensiveness of the Wassermann test, as well as of the fact that very few of the general practitioners of the state could make it.   The bill was very thoroughly debated in both houses, met strenuous opposition, was the subject of numerous amendments, upon some of which disagreements arose between the houses which were only settled by committees of conference, and it seems quite certain that the provisions of the bill must have been well understood.   It must be assumed also that the legislature had a

definite and certain end in view, that they did not intend to place a prohibition on marriage, but intended rather to safeguard it by the use of practicable and reasonable means.

With these presumptions in mind it seems very hard to reach the conclusion that they intended that the Wassermann test should be a prerequisite to the granting of every certificate, for this would mean a practical embargo on marriage. Nor do we think that the language of the act necessarily forces us to this conclusion. The act requires physical examination and "the application of the recognized clinical and laboratory tests of scientific search."

As to the meaning of the terms "clinical and laboratory tests," we adopt the definitions given by one of the physicians who testified for the petitioner. He says:

"The term 'clinical' is a term which is dependent upon the meaning of the word 'clinic.' *Clinos* or *clinum* in Latin means a bed, and the clinical tests of any disease are those that may be observed by the bedside or when the patient is in the office. Scientific and laboratory tests are tests of anything that may come under the purview or the examination of a scientific man which call for proofs by means of instruments, apparatus, or chemical reactions, which are incapable of imagination or sentiment. All the things that can be discovered at the bedside or upon the general examination of a patient when none of the tests that are dependent upon the use of instruments, apparatus or chemical examinations that are incapable of being influenced by imagination or sentiment are one thing and deal entirely with the imagination or opinion of the examiner. Those that are laboratory tests are such as bring out absolute and unquestionable proofs which are incapable of being influenced by sentiment or imagination."

It seems also that a clinical examination takes into consideration such parts of the history of the case as are credible and not probably lies on the part of the patient, and covers as well the objective symptoms which, as said by one of the physicians, are protean thousands in form. The term "physical examination" explains itself. It includes, of course, a

careful examination of the whole body, especially the sexual organs and the joints. As to the laboratory tests, it appears from the evidence of the physicians that in the case of gonorrhea there is a test called the Gram stain which is universally used and considered practically conclusive, certainly so when the objective symptoms are present. In the case of chancre or the primary stage of syphilis there is an examination of the discharges from the primary sore for treponema pallida with the Dorfield illuminator and the several so-called stains. In the secondary and tertiary stages of syphilis there is the Wassermann test and another called the Luetin test, sometimes called the Noguchi test, which is applied to the skin of patients suspected of syphilis. One physician calls these the only common tests, although another is named as experimentally used to some extent, called the Lange gold chloride test.

It is not claimed in this case that the Luetin test is included within the statutory command, although it seems to be a recognized test. Strict logic would seem to require the administration of the Luetin test if it requires the Wassermann test.

On this question as to whether the words "recognized laboratory tests" include all the tests which are in common use, some help may perhaps be obtained from the legislative history of the bill. As introduced the bill provided for the appointment by the board of health of special examiners not exceeding ten in each county (except Milwaukee, where the maximum was fixed at twenty-five). These examiners were to be licensed physicians of good moral character and scientific attainments, at least thirty years of age. Evidently it was contemplated that the examiners, as compared with the great body of the profession, should be experts, and, as the bill at that time provided for an examination covering inherited syphilis as well as acquired, it may be admitted as probable that it was in contemplation of its authors that all the known tests should be applied. The legislature, how-

ever, made two radical changes in the bill, both of which seem very significant on this question: first, they took out of its purview inherited syphilis, thus removing a very large field of cases in which the Wassermann test is specially valuable, if not practically indispensable, and removed the feature requiring the appointment of examiners.    By this last change the legislature empowered every licensed physician over thirty years of age in the state to make the examination when called upon to do so by a male applicant for marriage. We say this because we must regard every licensed physician as presumptively a person of good moral character and scientific attainments.    The board of medical examiners has no authority to license those who do not possess these qualities. Secs. 1435*b,* 1436*e,* Stats.

Now the legislature did not say *"all* of the recognized tests," but simply "the recognized tests."    Of course these latter words frequently and perhaps logically mean all, but do they as used in this law?    Here is a case where the legislature must be presumed to know that only an occasional medical practitioner can make the Wassermann test, and yet provides for the application of the recognized tests by every practitioner over thirty years of age.    When we consider this fact in connection with the other fact that there are recognized laboratory tests, to wit, the stains which can be made by all physicians with a well equipped laboratory, it seems quite impossible to believe that the Wassermann test was considered a *sine qua non.*

As has been before said, if the act is capable of two constructions, one of which will condemn it and the other save it from condemnation, we must give it the latter construction.    Now we have in this case the following circumstances which are entitled to be considered in arriving at the intention of the legislature in using the words "recognized tests:"

*First,* inherited syphilis is not within the purview of the law; *second,* all gonorrhea can be absolutely detected by the

physical examination and by the laboratory microscopical or Gram stain test, which can be applied by any physician with a well equipped laboratory; *third,* chancre or syphilis in its primary stage is easily discernible by physical examination; *fourth,* syphilis in its secondary stages is very easy of diagnosis by reason of the physical symptoms, the enlargement of glands, eruptions on the skin, and other changes; *fifth,* syphilis, after the secondary stage has passed, has either accomplished the ruin of the health, so that there is little or no possibility of marriage, or else has been so far cured as to be practically nontransmissible; *sixth,* the great majority of the cases of venereal disease (estimated by one physician at eighty per cent.) are cases of gonorrhea, leaving but twenty per cent. for cases of syphilis; *seventh,* the cases where the Wassermann test is really necessary for the detection of the disease are practically either cases of inherited syphilis or cases in which the disease has been so far controlled that physical manifestations are wanting and there is very small danger of transmission. The Wassermann test can be made absolutely of no avail by the patient himself, either by the so-called salvarsan treatment, or by the use of whisky for twenty-four hours before the blood is taken from the person.

In view of all these facts and in view of the fact that the legislature wished to reach practical and possible results, it seems unreasonable to suppose that they intended to prescribe tests which the great majority of the official examiners were not able to make. We prefer to construe the words "recognized tests" as intended to refer to the tests recognized and used by the people who were to make them. This construction sustains the law, makes it reasonable, accomplishes its evident purpose, and provides for a guard to marriage fully as effective in the vast majority of cases as the application of the Wassermann test.

We have not been able to appreciate the force of the contention that the law interferes in any respect with religious

liberty. We know of no church which desires its ministers to profane the marriage tie by uniting a man afflicted with a loathsome disease to an innocent woman.

In case of refusal of the certificate the law does not provide for a jury trial of the question, but only for a trial before the county judge, and it has been suggested rather than argued that this is a denial of due process of law. We find nothing in the objection. If it be, as we hold, within the police power to prohibit a marriage until the fact of the absence of venereal diseases in the male is ascertained, the power to determine that fact must be vested in some competent body or person, and the exercise of the police power does not wait upon the slow processes of jury trials. It might be argued with much force that a law which should attempt to make the right to marry absolutely and solely dependent on the determination of a single individual, even though a physician and an expert, would be unreasonable. In view of that possibility doubtless the provisions of sub. 4 were inserted in the present law, and we perceive no good reason for holding that they do not afford sufficient protection to the applicant. If the state can refuse to permit the diseased to marry, it must, of course, provide a means of ascertaining the fact, and if it provide a means which can reasonably be expected under all ordinary circumstances to ascertain the fact in accordance with truth, that must be sufficient. In our judgment the law before us provides such a means.

It is said that the fee provided by the law is entirely insufficient, even if the Wassermann test be not required. Upon this question there is a difference of opinion among the physicians. We incline to the opinion that the fee is a very meager one. We should not, however, feel justified in holding the law unconstitutional on this ground. The penalties provided by sub. 6 of the law are said to be extreme. This may be so. We do not feel required to pass on that question in this case. In any event, we cannot suppose that

these penalties are an indivisible portion of the law, or form in any sense a compensation for the other clauses.

*By the Court.*—Judgment reversed, and action remanded with directions to quash the alternative writ.

MARSHALL, J. (*dissenting*).  I cannot agree to the decision of this case because:

1. To marry is a natural right. ꞏ It is thus guaranteed by the purpose and spirit of the constitution: "All men are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."    Sec. 1, art. I, Const. of Wis.

2. Legislative authority, called the police power, to regulate natural rights is necessarily limited to safeguarding those rights.    That which ꞏconserves is, therefore, constitutional, while that which is so unduly oppressive as to materially impair is unconstitutional.    So it is held that those regulations which are promotive of rights are reasonable and constitutional while those which are not appropriate in kind to conserve, or are so severe as to be unduly oppressive, are unreasonable and unconstitutional.

3. The marriage right is a proper subject for legislative regulation; but not for legislative destruction or material impairment.    Whether the means of regulation are legitimate and whether the degree of restraint is unduly oppressive, are judicial questions.

4. The law in question requires, as a condition of competency to marry, that the male shall be free from any type of specified human infirmities, the proof to be made by scientific tests, which the evidence shows but few are sufficiently expert and have the instrumentalities to apply, and which cannot be applied for the fee named in the law, or without such expense as to operate as a serious restraint upon mar-

riage, and the result of which would be liable, in many cases, to take away the right, though there were no acquired infirmity of the particular kind and none of transmissible character,—an entire absence of danger as to the wife and ·none as to descendants,—except within mere possibility,—so remote as to be infinitesimal,—or less than danger from any one of several infirmities which lawmakers would not venture to set up as a prevention of marriage.

5. It is legitimate to condemn a separable part of an enactment and sustain the rest, where there is reasonable certainty that the legislature would have enacted the latter had it appreciated the invalidity of the former, and where such latter, by itself, forms a complete workable enactment; and, where there is ambiguity in an act and, yet, it will admit of a reasonable construction which will sustain it, and there are no persuasive circumstances to indicate legislative intention not to include the legitimate idea, that is to be regarded as the proper one; but the court cannot properly ascribe a meaning to an enactment which cannot reasonably be read out of it, nor one which plainly violates the legislative purpose. To do the latter would be to make law instead of declaring the law as made by the lawgivers.

6. According to all evidence in this case' the enactment in question means one thing and cannot reasonably be said to mean anything else, and all concede that, given such meaning, it is, unquestionably, a destructive interference with the marriage right. There is no legitimate way, in my judgment, of judicially recasting the legislative work in that respect. Rules for construction are not adequate for the situation. If there were less of, in effect, judicially making written law over by weeding out inconsistencies and twisting words out of their natural or obviously designed orbit so as to make them operate sensibly and conservatively instead of destructively, there would be less efforts to make people conform to artificial standards set up by well meaning theorists,

regardless of personal liberty and the very spirit and purpose of our system.

7. The penal features of a police regulation, designed to prevent and punish its violation, are such an essential portion thereof as to be inseparable therefrom. Without them the law would be a collection of words without vitality, which a legislature would not, consciously, indulge in. Therefore, where such element is so harsh as to violate the prohibition of cruel or unusual punishments, or so tends to terrorize as to prevent freedom of appeal to the courts for redress or prevention of supposed wrongs, the whole enactment partakes of the unconstitutional character of such element and is void. *Ex parte Young,* 209 U. S. 123, 28 Sup. Ct. 441; *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885.

8. The penal clause here seems to be in the class with those found to be fatally unusual and unduly oppressive in the cases above cited. It is conceded, as I understand it, that it is impracticable to satisfy the certificate prescribed by the law,—in any event the evidence seems all one way on the subject, and that something less severe as to the examination must be found to be satisfactory, yet, if a county clerk issues a license, except upon the particularly worded certificate, he will be guilty of a felony and liable to confinement in the state prison for the term of five years. So if an intended bridegroom finds himself unable to carry out his promise, or an intended bride finds herself stranded, so to speak, on the shoals of this drastic regulation,—though there be no real danger in the contemplated union being consummated,—or if the parents of either or any one having knowledge of the facts, though acting from the purest motives and in explanation of the unfortunate dilemma, discloses the reason why the mutual promises cannot be carried out, such person will be liable to punishment by confinement in the state prison for five years. The mere statement of the matter seems enough to condemn the act utterly

9. There is no reasonable necessity for such a law, as the evidence amply shows. It is competent for any prospective wife to protect herself, or, in most cases, her parents to do it in her behalf, as fully as the legislation was designed to do and accomplish it by treaty. There is perfect freedom of self-protection by demanding evidence of purity as a condition of marriage. Why should the public step in because of a case of danger now and then, and impose on the great mass of men the burdens of such a law? That it is an interference with a right which goes so far beyond fair conservation as to materially impair, seems plain.

10. Recapitulating: The act unduly casts suspicion of immorality and criminality of most serious nature upon every male candidate, present, prospective, or possible, for the marriage state. It imposes such an oppressive burden upon all such candidates as to proving competency to enjoy the natural right of marriage, or so takes such right away without justification in many cases and restrains its exercise generally, as to efficiently discourage an institution which is absolutely essential to public welfare and so recognized and protected by the fundamental law. By so oppressively interfering with the constitutional right of marriage as to partially or wholly destroy that right, the tendency will inevitably be to promote immorality and social and racial retrogression. The penal feature is so severe as to destroy freedom of appeal to the law of the land for redress. To so read the law as to take from it any of these infirmities is to go outside the judicial field and make a law.

For the reasons stated, I think it is the duty of the court to condemn the act in question as subvertive of constitutional liberty and right. That the motives of those whose activities resulted in imposing such enactment upon the people of this state were of the purest, I do not question; but if all the well-meant suggestions of volunteer social reformers were vitalized by written law, we might have a system worse than

anything yet ventured upon, even under the paternalism of nations unfettered by constitutional safeguards, and all our rights would be turned into mere uncertain privileges and practically destroyed. To prevent despotism of that kind is one of the most important functions of constitutional guaranties coupled with an independent judicial agency to enforce them. I think here is a case where enforcement is required. I think to thus meet the situation, would consist with the requirements of judicial duty and result in greater care in giving legislative sanction to well-meant suggestions thrust upon attention and appreciation that, "The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles."

The court's opinion constrains me to add this:

The history of a legislative enactment may be looked to in aid of judicially clearing up its obscurities, but not to justify putting words into or taking words out of it not therein or thereout by reasonable implication; and, in the end, no meaning can properly be ascribed thereto, not fairly found expressed by the words thereof, taken in their reasonable scope,—which violates the rules of language or of law,—even though there be evidence *aliunde* the writing that such was the legislative purpose. To overstep this is to make rather than to declare and apply law, forgetting "that the judicial office is *jus dicere, et non jus dare.*"

An act of the legislature regulating civil conduct establishes public policy within the scope of legislative power; but when the enactment contravenes the higher public policy, enshrined in the fundamental law, the latter prevails and the former is not law at all.

The statement "that the police power does not wait upon the slow processes of jury trial" is rather too broad and in my opinion is subject to many important exceptions accord-

ing to the situations dealt with.    Where the subject is a principal constitutional right, like that of marriage, and opportunity for jury interference is so essential for its due conservation, to take away or materially impair it without such opportunity,—there being no imperative necessity therefor,—would be destructively harsh and not due process of law in a constitutional sense, and inconsistent with the spirit of the fundamental law.    If there is any imperative necessity why the right of marriage should be liable to confiscation as under the law in question, without opportunity for the protection against injustice afforded by opportunity for some semblance of a common-law hearing, none has been suggested.

I think I as fully appreciate as any one the importance of social purity and protection of the newly elected mothers of the races to come from contamination and suffering; but there is reason in all things and there is a realm beyond and between the two stands the constitution.    Removal of all responsibility for self-care would eventually result in a weak and degenerate race.    Undue regulations of ordinary affairs and rights tend to produce the very condition they are aimed to prevent, or something worse, and are self-destructive where not unconstitutional.

I have aimed to state my views of the legislation in question in its constitutional aspect with a minimum of discussion of the enactment in detail, preferring to formulate, concisely, elementary principles, associated with a few observations appropriate to the situation and trust the reader to apply them to the act and the court's opinion as they will be found in the report of this case.    If those principles, briefly illustrated, without the aid of judicial decisions, do not efficiently indict and condemn the enactment they will show much clearer the grounds for my opinion than lengthy discussion would and will be more likely to be helpful in respect to future legislative efforts.

Vinje, J. I concur in the foregoing dissenting opinion of Mr. Justice Marshall.

Timlin, J. (concurring). The statute in question, ch. 738, Laws of 1913, requires that, upon application for a marriage license, the male party to such marriage must, within fifteen days prior to the application, be examined by a physician of designated qualifications with reference to the existence or nonexistence of any venereal disease in such male person. The licensing officer is prohibited from issuing a license unless a certificate of such a physician is presented setting forth that this male person is free from acquired venereal disease so far as can be determined by the recognized clinical and laboratory tests of scientific search. Physicians were called as witnesses in the court below and some of them testified, in substance, that the recognized laboratory tests of scientific search include what is known as the Wassermann test for syphilis. This test requires a special laboratory equipment, and out of 3,000 physicians in this state not more than twenty-five, and out of 300 physicians in Milwaukee county not more than six, are equipped or prepared to apply the Wassermann test. That the fee of $3 fixed by statute is unreasonably small for making the Wassermann test, for which the reasonable charge would be about $25. The Wassermann test is described in volume 20, present edition of The Americana, subject "Syphilis," and the description need not be repeated. It is said to have been in use about seven years, and in the encyclopedia mentioned is somewhat discredited already, and the testimony in this case corroborates such discredit. For it was quite unanimously agreed upon that repeated experiments covering quite a long period of time were necessary, that a negative result did not prove the subject free from syphilis, while a positive result meant that the subject had measles or scarlet fever or tuberculosis or

typhoid fever or diphtheria or diabetes or syphilis. Also that this test may be frustrated and a negative result obtained by a syphilitic if, preparatory to the test, he load up with alcoholic liquor, salvarsan, or some form of mercurial medication. In the primary and secondary stages of syphilis the diagnosis may be made by inspection of the affected parts; in the third or tertiary stage this cannot be done, usually, and it is in this latter stage that the Wassermann test fails most frequently. There are other laboratory tests besides the Wassermann test. These other tests, or some of them, consist of a microscopic examination and pigmentation for the purpose of identifying the bacteria found in the discharge from the affected parts. It seems to me that such testimony goes a long way toward proving that the use of this Wassermann test was not within the contemplation of the lawmakers. The statute indicates that they had in mind laboratory tests which would be completed within fifteen days and which would be ordinarily compensated by a fee of $3 and which were understood and practiced by ordinary physicians of good character and standing throughout the state. The rule that statutes should be interpreted with reference to the popular and ordinary understanding of the language employed is a very constant and common-sense rule of law. The legislators probably never heard of the Wassermann test. But they may be presumed to have had the capacity of intelligent persons, the same sort of information, and the same knowledge on this subject. From this viewpoint we can say that they believed the three principal venereal diseases were gonorrhea, syphilis, and chancroid; that these diseases were each of bacterial origin; that the micro-organism of each was distinct and capable of identification by microscopic examination and staining; and that these last simple laboratory investigations were the laboratory tests referred to in the statute.

I do not concede that, weighted down with the Wasser-

mann test, the law would be unconstitutional if it were valid without this handicap, but I do think that it cannot be held upon any fair interpretation of the statute that the legislature intended that the laboratory test required was one which but few physicians could apply, which required such a long time and was so uncertain in its results, and which could not be performed for the fee fixed by the statute. There could not, I think, be much doubt of this were it not for the use of the words "scientific search." It seems to me, however, these words were employed to require something more than a mere physical inspection of the person. The words "recognized laboratory tests" mean, I think, those commonly recognized and those ordinarily practiced; those recognized by common usage, not necessarily including all those known to or recognized by the few intellectuals in advance of their day and of the body of their profession.

Taking in this wide sweep would include those laboratory tests which obtain recognition for a few months or a few years and then are abandoned and forever afterwards strangers to science. "Recognized" here and in this connection means "well known," "accepted," and "established." The law requires us to find the statute constitutional if by any reasonable interpretation it can be made to conform to the constitution, and not to search after something which would tend to make the statute invalid. Is the statute, thus interpreted, constitutional? The learned circuit judge thought that it conflicted with sec. 1, art. I, and sec. 18, art. I, of the state constitution. The first is a declaration that all men are born equal, free, and independent, and have certain inherent rights; among them life, liberty, and the pursuit of happiness. The second relates to freedom of worship and liberty of conscience. It is not contended that the state constitution elsewhere, by express interdict or by necessary implication, prohibits the legislation in question. The statute in question, although often alluded to as "The Eugenic Mar-

riage Law," has little relation to that pseudo science called "Eugenics." It is primarily a law to prevent the spread of contagious diseases and regulative of the marriage contract, adding to the requirements of age, lack of relationship within the prohibited degree, license, etc., the further requisite of a certificate of freedom from venereal disease. This is also indicated by the limitation to "acquired" as contradistinguished from "inherited" venereal diseases, and it seems to me the statute calls for this construction. This is a subject well within the regulative power of the legislative branch of government, unless prohibited by the constitution. Freund, Police Power, § 124; *In re McLaughlin's Estate,* 4 Wash. 570, 30 Pac. 651; *Reynolds v. U. S.* 98 U. S. 145; *Gould v. Gould,* 78 Conn. 242, 61 Atl. 604, 2 L. R. A. N. s. 521; *Maynard v. Hill,* 125 U. S. 190, 8 Sup. Ct. 723; *Boehmer v. Kalk,* 155 Wis. 156, 144 N. W. 182.

I have much doubt whether the state or condition called "happiness" in the constitution, or the state, condition, or occupation there described as "the pursuit of happiness," is capable of judicial ascertainment or identification. This process would seem to be necessary before a court could determine whether a given statute impinges against or encroaches upon such state or condition. It is, however, quite unnecessary to determine this question here, for, assuming for argument's sake that the vague generalization quoted does guarantee to the citizen certain rights which the legislature may not by statute take away, still the exercise of all constitutional rights is subject to reasonable regulation in the public interest under the so-called police power of the state. Before the statute in question could be declared invalid on this hypothesis it must appear that the statute was not at all conducive to the preservation of public health, welfare, or morals, or that it carried regulation to an unreasonable or unnecessary extent and so as to interfere seriously with constitutional rights. It is said by those who have studied the

subject that there are no reliable statistics to show the prevalence of venereal disease in civil life. The most contradictory and conflicting estimates may be found. Gonorrhea seems to be about four times as prevalent as syphilis; the latter and chancroid about equally prevalent. There are those who claim that syphilis is not inherited, but affects the offspring merely because the bacterial organisms causing the disease have their habitation in the genito-urinary organs and so reach the fœtus and inoculate it by contact, and there are authorities denying this. All, I think, agree that these three venereal diseases are contagious and communicable by contact with the mucous membrane. Gonorrhea is the more readily cured, but all are curable, at least in the early stages of the disease. In bulletins of the federal Bureau of the Census relative to marriage and divorce these diseases are not expressly noted as a cause of divorce, and if they are included under some general designation, still they do not seem to figure largely as a cause. A bulletin of the same bureau entitled "Mortality Statistics," enumerating 171 causes of 730,538 deaths in territory preponderatingly urban, ascribes only 2,999 to venereal diseases, and of this 1,582 were infants under one year and 1,735 children under five years of age. Bulletin No. 108 (1910).

In vol. 5, part 2, pp. 324 to 368, "Transactions of the Fifteenth International Congress of Hygiene and Demography," are several papers on this subject, in one of which (p. 338) Dr. Lung endeavors to show that venereal diseases are as prevalent in civil life as in the United States navy. If this is correct, they are very prevalent. Chapin on Municipal Sanitation in the United States contains the statement that these diseases are very prevalent, but the only definite figures given relate to 2,886 examinations in ten months of 230 prostitutes, which discovered only forty-two cases. In the army and navy, and in cases of applicants for enlistment as soldiers or sailors, superior opportunities for

observing and recording cases of this nature exist, and concealment by the afflicted person is next to impossible. Here we find that the army and navy of the United States leads the world, having the highest percentage of these three venereal diseases, although the British army and navy is a little ahead of us, and of the rest of the armies of the world, in syphilis. Norris, Gonorrhea in Women (1913) pp. 137, 138.

This condition of our army and navy is thought by some to be largely due to the greater influence in this country of well-meaning and emotional, but illy-informed, persons, who reject the teachings of experience elsewhere and refuse to recognize the prostitute by compelling her to submit to inspection and regulation. It does not seem probable that this high percentage of venereal disease in the army and navy measures the prevalence of such diseases in civil life, but it shows that there is enough in the last mentioned walks of life to justify legislative action in prevention of its spread. It is also thought by the highest medical authorities that the main source of venereal infection is the prostitute, and that here regulation and prevention may be made most effective.

We are not authorized to set up our judgment on such matters against that of the legislature or do more than measure the statute against the constitution, and if we find therein no prohibition expressed or necessarily implied against such legislation the statute must be enforced.

For my part I have no sympathy with this statute. I think it tends to discourage marriage rather than to prevent the spread of venereal diseases. All experience goes to show that laws making marriage expensive or difficult or subject to objectionable requirements tend to increase illegitimate sexual intercourse. The latter tends to promiscuousness, hence to the spread of venereal diseases. The notion that wives are infected only by husbands who at the time of marriage have venereal diseases seems very simple. If a man

knows that he has a venereal disease and notwithstanding this desires to be married, he will not submit himself to any honest examination for very obvious reasons. He. will go out of the state to be married. If he has such disease and does not know it he must be quite unsophisticated. If there are cases where a man is so afflicted and does not know it, they must be so rare as to be quite negligible for the purpose of justifying such legislation. So I think the law will reach only those males desiring to marry who have no venereal diseases and therefore do not fear the examination, or those who have so little sense or so little disease as to be unaware of their affliction. In case a marriage engagement is announced a year or thereabouts before marriage and the prospective groom fails to pass the examination and must either break the engagement or resort to the scandalous or mortifying appeal to the county judge, neither the bride nor her parents are allowed to disclose any matter relating or pertaining to the examination of the applicant for a license to marry. This may be a great damage to the girl, give rise to unworthy suspicion and gossip, and the penalties imposed upon persons making such disclosure are, I think, exorbitant and unreasonable, as are those imposed on the county clerk who shall unlawfully issue a license. But I think this part of the act can be held invalid without affecting the validity of that portion of the act requiring an examination by and a certificate from a licensed physician to the effect that the male person intending to marry is free from all venereal diseases so nearly as can be determined. The form of the certificate itself is a sort of an insult, a Scotch verdict of "not proven;" and the statute in all its parts is, in my opinion, about as silly and obnoxious a piece of legislation as could be devised. But the ineffectiveness of the law, or its folly if it be foolish, or the fact that it was passed in a modern spirit of legislating first and investigating afterwards, is quite remote from the question of its constitutionality. The people

must learn to hold their legislators responsible for the enactment of laws which, however unwise and absurd, are still within the constitutional power of the legislature. It will be for the benefit of both the people and the legislature to recognize this responsibility and to know that they cannot look to the supreme court for relief in every case of an objectionable but constitutional law. So long as the legislature believes there was enough venereal disease in this state to justify the enactment of the statute in question, we cannot gainsay it, for that was a matter for the legislature to decide. Assuming the prevalence of venereal disease, its contagious nature, and its communicability by contact, it was within the power of the legislature to enact statutes wholly or partially preventative of the spread of these diseases. If the legislature libeled the people of this state by making it to appear that venereal diseases were prevalent here when in fact they were not, the members of that body must for such error answer to the electors and not to the supreme court. If I concede, as I must, the power to require a marriage license, I must also concede the power to require of the licensee reasonable qualifications, and it cannot be said to be unreasonable that he be free from venereal disease.

I cannot imagine how this law can be said to interfere with freedom of worship or liberty of conscience. The notion that marriage was a sacrament, not a civil contract creating a status, once vigorously asserted, has long since passed away. A point is made that requiring the prospective husband to submit to the examination without making the prospective wife do so conflicts with the Fourteenth amendment to the United States constitution, which forbids the states to deny the equal protection of the laws. But the men desiring to marry form a very definite class quite germane to the object sought to be accomplished by the statute. And we read in the learned medical treatises that while the primary source of venereal infection is usually the prostitute, still such dis-

·eases are generally brought into the family by the husband rather than by the wife. The legislature was justified in so deciding.

It is probable that in an action by a doctor under thirty years of age but otherwise qualified, or by an applicant for a license who held a certificate from such physician as is last described, that portion of the statute in question which requires the applicant for a marriage license to present to the licensing officer the certificate of a physician "at least thirty years of age" would be held invalid under the rule of *Smith v. Texas,* 233 U. S. 630, 34 Sup. Ct. 681. But the relator is in no position to raise this question, and the last mentioned part of the act is clearly severable from the remainder and ·cannot be said to be either an inducement to the enactment in question or an essential part thereof without which the legislature would in all probability not have enacted the remainder of the statute. I find no ground for holding that part of the statute here involved unconstitutional.

BARNES, J. (*concurring*). I concur in the result, but do not agree with all that is said in the opinion.