[File No. 6910.]

NEW YORK LIFE INSURANCE COMPANY, a corporation, Respondent, v. PEGGY FLECK, LeRoy Fleck, Lenore Fleck, also known as Lendre Fleck, and Myron Fleck, Appellants.

(12 NW(2d) 530)

Opinion filed January 3, 1944

*Murtha & Murtha,* for appellants.

144

*Clyde L. Young,* for respondent.

BURR, J.   Defendants appeal from a judgment canceling a life in-surance policy issued October 16, 1939, on the life of one John Fleck, who died June 21, 1941.   The action was commenced August 16, 1941, and the complaint alleges, among other things, that the policy was issued upon certain false and fraudulent representations material to the risk, made by the insured in his application, that the statements

and representations were relied upon by the plaintiff and believed to be true "and that the insurance policy aforesaid thereafter was issued by reason thereof and by reliance thereon and not otherwise." Further, that the fraud was not discovered until August 1, 1941, and plaintiff tenders all premiums paid on the policy.

The sole issue involved is consummated by the following paragraph of the answer: "That any statements made in said application or in the policy or otherwise made, given or represented by the applicant, John Fleck, were all made in good faith and that he believed the same to be true, and that if the said John Fleck had any of the diseases or ailments or operations mentioned in the plaintiff's Complaint, that he had no knowledge of the same and that all answers and representations made by John Fleck were at all times true to the best of the knowledge, information and belief of the said John Fleck, and that all representations and answers made by him were made in good faith."

The alleged false and fraudulent representations are based upon the following questions and answers in the application:

"1. (a) Have you within the past five years been continuously and are you now in good health? Yes.

"8. (a) Have you now, or have you ever had, or ever been told that you had, tuberculosis of the lungs or any other part of the body, spitting of blood, high blood pressure, heart trouble, kidney trouble, diabetes, disease of brain or nervous system, paralysis, epilepsy, syphilis, cancer or tumor, stomach or intestinal ulcer? No.

"8. (b) Have you ever undergone any operation, or have you ever been under observation or treatment in any hospital or sanitarium? No.

"8. (c) Have you now, or have you ever had, any deformity, spinal curvature, lameness, loss of limb, rupture, impairment of sight, speech or hearing? No.

"8. (e) Have you lost any time from work through illness during the last five years? No.

"9. State below each ailment, disease, impaired condition of body or mind, surgical operation or injury, which you have had within the past five years, and the name of every physician or practitioner, if any, whom you have consulted or who treated you. None.

"10. What physicians or practitioners, if any, not named above, have you consulted or been examined or treated by within the past five years? Dr. M. Heffron. March 1939. Reason for Consultation, Examination or Treatment or Results. Cold–Results–Cured.

"11. Have any blood, urine, x-ray or any other laboratory tests been made for you within the past five years? Yes.

| Reasons for Test | Nature of Test | Results | By Whom Made |
|---|---|---|---|
| K. C. Blood Donors Club | Loaned Blood | O.K. | Dr. Reichert |

"Following the interrogatories the insured in the application stated: 'On behalf of myself and of every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the Company believing them to be true shall rely and act upon them.''

The court ordered cancellation and the appellants' specifications of error center on the contention that the court erred in finding there was any evidence of fraud or misrepresentation on the part of the insured; in finding that the plaintiff would not have issued the policy had the true facts been known; that there is nothing in the testimony to show the insured at any time "had actual knowledge that he was suffering from any disease or ailment;" or knew that he had had any operation and, further, "that there is no evidence to show a 'laboratory test' though there might have been a 'microscopic examination' as to a gland in the neck."

The chronology of the case is significant in its bearing upon the knowledge of the insured as to his condition in September 1939.

In the latter part of June, 1939, the insured consulted Dr. A. J. Gumper of Dickinson, claiming to be suffering from a cold.

In the latter part of August he returned to Dr. Gumper for examination and at that time Dr. Gumper determined insured was suffering from Hodgkins Disease. Dr. Gumper removed a gland from the insured's neck, sent it to the University for a laboratory test, accom-

panied by his own report as to his diagnosis. The portion of the gland received at the University was about one-half inch in length, or, as the pathologist stated, "1.5 cm."

September 1 the pathologist at the University sent to Dr. Gumper his report on the test, confirming the diagnosis of the doctor.

Immediately thereafter, Dr. Gumper and the insured had some conversation and the doctor advised the insured to go to the Mayo clinic at Rochester, Minnesota, for examination. The doctor states:

"Q. What was done following the receipt of that report, doctor, with reference to the method of handling the case for Mr. Fleck? Did you advise him to go elsewhere or what happened as a result of the report?

"A. We of course felt that he should have confirmation of the diagnosis that was made and we advised that perhaps he go to Rochester to see if they could confirm our diagnosis."

\*      \*      \*      \*      \*      \*

"Q. Just to make it clear, you go on and say he was not told when (what) he had?

"A. No, he wasn't told when here that he had Hodgkins Disease, not that I know of. It was always difficult to handle him and we never wanted to tell him what he had. I don't know whether anyone ever told him he had Hodgkins Disease. We refrained from telling him at all times; that was one of the purposes of sending him to Rochester to let that be taken care of there."

September 30, insured made his application for the policy involved, giving the answers as hereinbefore set forth. The application contains this statement: "On behalf of myself and of every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the above answers, that they are each written as stated by me, and that each of them is *full, complete,* and *true,* and agree that the Company believing them to be shall rely and act upon them."

On October 16, 1939, the policy was issued, the application being made a part thereof. The policy recites, "all statements made by the insured shall in the absence of fraud be deemed representations and not warranties    . . .."

In the latter part of October the insured went to the Mayo clinic for examination, remained there six days, and returned to his home November 2, 1939.

Dr. Gumper testified that when the insured returned from Rochester the treatment for Hodgkins Disease was continued by him until the death of the insured.

The uncontradicted testimony offered by the plaintiff is that in approving the application the company relied "principally upon the answers given by Fleck in his application dated September 30, 1939;" and the officer whose business it was to pass upon applications had no "reason to believe that the answers given in that application were untrue, false, or incomplete." Further that the application would have been declined had the company known from any source "that in August, 1939, Fleck had consulted a physician who had found enlarged glands in the right side of the neck and who, after having a pathologist's examination made, had a diagnosis of Hodgkins Disease."

The record is undisputed that the company knew nothing about the falsity of these statements contained in the application until the proofs of death were furnished. The death certificate was prepared by Dr. Gumper and showed the insured had died of Hodgkins Disease and this doctor furnished the information required in proofs of death..

The trial court found that these answers given by the insured were false, and materially increased the risk. In the statement of facts set out in their brief appellants state, among other things:

"That Dr. Gumper . . . was acquainted with John Fleck. That prior to his death he was engaged as his physician. That he saw John Fleck the latter part of June, 1939. That then in about August of 1939 he took a gland out of the neck. That he had a section made for microscopic study and sent a portion of the gland to the Pathology Department of the University of North Dakota. That he diagnosed it himself as Hodgkins Disease at the time. That the said Department diagnosed it as Hodgkins Disease and sent in their findings September, 1939. In September, 1939, [he] advised Fleck to go to Rochester. That he treated him for Hodgkins Disease up to the time of his death. . . . Fleck did not think it was necessary to have a gland taken out of the neck, but he was persuaded by the doctor. He was not told that he

had Hodgkins Disease. . . . That the Company would not have insured him had they known he had Hodgkins Disease. That it is a fatal disease. That the Company relied upon the answers given in the application by John Fleck. That had the Company known he had Hodgkins Disease they would not have issued the insurance policy."

The findings of the trial court are clearly supported by the evidence. His statement was false in saying he had not been treated by any physician for any ailment or consulted any physician within five years prior to making his application other than this treatment by Dr. Heffron. His statement was false in his answer to 1(a). The insured answered falsely when he said no laboratory tests had been made for him within the past five years, except that he had furnished blood for the blood donors' club. He could not have forgotten he had consulted Dr. Gumper, nor could he have forgotten Dr. Gumper advised him to go to one of the most famous medical clinics in the world.

Section 6501, Comp. Laws provides: "No oral or written misrepresentation made in the negotiation of a contract or policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching, unless such misrepresentation is made with actual intent to deceive, or unless the matter misrepresented increased the risk of loss."

This section contains two separate and independent provisions, either of which will avoid a policy. Equitable Life Assur. Soc. v. Boisvert, 66 ND 6, 12, 262 NW 188, 191.

That the falsity of these statements materially increased the risk needs no demonstration. Clearly the company would not have insured deceased if it had known he had a fatal disease. The misrepresentation, whether understood thoroughly by insured or not, did in effect lull the plaintiff. Reasonable minds can not differ on that question.

Appellants attempt to avoid the effect of the uncontradicted facts. It is argued the insured was not guilty of a concealment as defined by § 6480 of the Compiled Laws which provides: "A neglect to communicate that which a party knows and ought to communicate is called a concealment." He should have answered truly and omission is at times as much a concealment as commission.

Appellants argue there is no proof of any materiality and that un-

true statements which were within Fleck's knowledge would not have prevented the insurance company from issuing the policy. This is contrary to their statement of the facts as set forth heretofore. Their position seems to be that ignorance of the truth is always a defense. When one has good ground for surmising otherwise he can not hide behind ignorance. He is not permitted to say "No" when he suspects "Yes" may be the answer. In a prosecution for perjury "an unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false." Section 9373, Comp. Laws. This principle applies here.

In National Life & Acci. Ins. Co. v. Nagel, 260 Mich 635, 245 NW 540, involving an application for reinstatement, the court said, referring to the statement by the insured:

"It was in fact a false representation but made in ignorance of his true condition and therefore without actual intent to deceive but it materially affected reviver and continuance of the risk . . . ."

In a later case, the same court states: " 'An insurance policy may be cancelled for an untrue statement made in good faith or even in ignorance of its falsity, if such misrepresentation materially affected the assumption of the risk by the insurer.' Prudential Ins. Co. v. Ashe, 266 Mich 667, 254 NW 243."

The insured certified in his application that these answers were full, complete, and true. He made them expressly for the purpose of having the company rely thereon.

When there is no dispute as to the facts, the issue becomes a question of law, and when the facts are found against the defendants, as they are here, the rules laid down in Thomas v. New York L. Ins. Co. 65 ND 625, 260 NW 605, govern, and the law cited and considered in that case is the law applicable.

Appellants urge that there is no proof of any laboratory test. They ignore the testimony of insured's physician to the effect that he sent the gland to the University for that purpose. They ignore the report of the pathologist at the University.

Appellants argue there is no definition of laboratory test set forth and that no one knows what such term means. There should be no difficulty in understanding such a term. A laboratory is the room or place

which the chemist or the scientist devotes to his experimental work, and the laboratory test is a scientific treatment of whatever material is sent to the scientist for examination, testing, or analysis by instruments, apparatus, and chemical reactions, to determine elements, force, disease etc., without being influenced by sentiment. See Peterson v. Widule, 157 Wis 641, 147 NW 966, 970, 52 LRA(NS) 778, Ann Cas 1916B 1040.

It is true the insured may not have known there was a laboratory test, but he expressly said there was none. He asserted as a fact that which was false and which he had no reason to believe was true.

The application made by the insured contains this statement: "It is mutually agreed as follows: 1. That the insurance hereby applied for shall not take effect unless and until the policy is delivered to and received by the applicant and the first premium thereon paid in full during his lifetime, and then only if the applicant has not consulted or been treated by any physician since the time of making this application; provided, however, that if the applicant, at the time of making this application, pays the agent in cash the full amount of the first premium for the insurance applied for . . . and receives from the agent a receipt therefor on the receipt form which is attached hereto, and if the company, after investigation and such medical examination, if any, as it may require, shall be satisfied that the applicant was, at the time of making this application, insurable . . ., then said insurance shall take effect and be in force under and subject to the provisions of the policy applied for from and after the time this application is made, whether the policy be delivered to and received by the applicant or not."

The appellants urge that the insured paid the first premiums at the time of making the application, obtained the required receipt, that there is no proof he consulted or had been treated by any physician after he made his application and before the issuance of the policy, and therefore the contract is not now subject to attack as in this suit. Such provision has no bearing on the issues here. Ordinarily the insurance would not go into effect until the policy was delivered. This provision covered the gap between the two dates. It gave the insured the rights which would have been his had the policy been delivered on the date of

application. It contains no waiver of right to attack the contract because of fraud. The judgment of the lower court is affirmed.

MORRIS, Ch. J., and BURKE and NUESSLE, JJ., concur.

CHRISTIANSON, J. (concurring specially). I agree with the principles stated in the syllabus, and with the result reached in the opinion prepared by Judge Burr, but I am not prepared to subscribe to all that is said in that opinion. I agree that certain answers in the application for insurance were incorrect, and operated to present certain material facts as being otherwise than they actually were; but I am not satisfied that the insured actually intended to deceive and defraud the insurance company, or that he gave untrue answers in all the instances stated in the opinion prepared by Judge Burr.

The insured consulted Dr. Gumper at Dickinson for a sore throat in the latter part of June, 1939.

Dr. Gumper testified: "He came up for examination for sore throat and not feeling well and most complaint was sore throat and he was examined and in. the course of examination a couple of glands were noticed in the neck that felt swollen and in view of the fact of that swelling we advised him of the routine and we gave him some diathermy treatment, I think, at that time. We also advised him to report back in a week or ten days. At that time he said he felt better. He came in late in the afternoon and we wanted to have a section of these glands, and we were insistent and got it. He was a little diffident about it, didn't think it was necessary and *didn't want to have it done. Somehow or other we got him where we could take out one of the glands and we proceeded to do that.*

"Q. How do you take out a gland?

"A. It is quite simple. We injected a little local anesthetic under the skin and removed one of the infected glands.

"Q. Just to make it clear, you go on and say he was not told what he had?

"A. No, he wasn't told when here that he had Hodgkins Disease, not that I know of. It was always difficult to handle him and *we never wanted to tell him what he had. I don't know whether anyone ever told him he had Hodgkins Disease.* We refrained from telling him

at all times; that was one of the purposes of sending him to Rochester to let that be taken care of there."

Dr. Gumper at no time testifies that the insured was informed that a gland had been removed, and sent to the Department of Pathology of the State University. If the insured had known that a gland had been removed and sent to the University, he probably would have inquired as to the result of the examination, yet that apparently never occurred, as Dr. Gumper says, "We never wanted to tell him what he had. *I don't know whether anyone ever told him he had Hodgkins Disease. We refrained from telling him at all times.*"

Nor does the evidence show that insured knew that a gland had been removed for examination. Indeed, it is doubtful if he knew that a gland had been removed at all. The first time the insured saw the doctor, his throat was examined, and he was given diathermy treatment. The second time the insured called, the doctor broached the matter of removing a section of a gland. The doctor says, the insured "didn't want to have it done"; but that *"Somehow or other we got him where we could take out one of the glands and we proceeded to do that."* The doctor explains that this was quite a simple matter.

It seems to me that this testimony tends to show that the insured did not have any laboratory test made, and did not know that any such test had been made, and that he was entirely truthful when he answered the question (question 11 in the application)—: "Have any blood, urine, X-ray or any other laboratory tests been made for you within the past five years?", as he did answer it.

There is no evidence as to the circumstances in which the application for insurance was taken. The application shows on its face that it was taken by an agent of the plaintiff. The answers were filled in by such agent, and the receipt for the first premium was signed by him.