## *In re* WONG YUNG QUY, on *habeas corpus.*

*(Circuit Court, D. California.* May 24, 1880.)

CONSTITUTION—DISINTERMENT OF CHINESE.—The statute of California making it an offence to disinter or remove from the place of burial the remains of any deceased person without a permit, for which a fee of $10 must be paid, does not violate subdivision 3 of section 2, article 1, of the constitution of the United States, providing that "congress shall have power to regulate commerce with foreign nations."

SAME.—Nor does it violate subdivision 2 of section 10, article 1, providing that "no state shall, without the consent of congress, lay any impost or duties on * * * exports."

SAME.—Nor is it in conflict with the fourteenth amendment, which prohibits any state from denying to "any person within its jurisdiction the equal protection of the laws."

SAME.—TREATY WITH CHINA.—Nor does it violate the fourth article of the treaty with China, called the Burlingame treaty, which provides that "Chinese subjects in the United States shall enjoy entire liberty of conscience, and shall be exempt from all disability or persecution on account of their religious faith or worship." 16 Stat. 740.

SAME.—The act is a sanitary measure within the police powers of the state, and as such is valid.

A CORPSE IS NOT PROPERTY, and the remains of human beings carried out of the state for burial in a foreign country are not exports, within the meaning of the clause of the national constitution prohibiting the laying of imposts or duties by the state upon exports.

*Geo. E. Bates* and *J. M. Rothchild,* for petitioner.

*Crittenden Thornton,* for respondent.

SAWYER, C. J. On April 1, 1878, the legislature of California passed an act entitled "An act to protect public health from infection, caused by exhumation and removal of the remains of deceased persons," sections 1, 2, 3, 4, and 6 of which are as follows:

"Section 1. It shall be unlawful to disinter or exhume from a grave, vault, or other burial place, the body or remains of any deceased person, unless the person or persons so doing shall first obtain from the board of health, health officer, mayor, or other head of the municipal government of the city, town, or city and county where the same are deposited, a permit for said purpose. Nor shall such body or

remains disinterred, exhumed, or taken from any grave, vault, or other place of burial or deposit, be removed or transported in or through the streets or highways of any city, town, or city and county, unless the person or persons removing or transporting such body or remains shall first obtain from the board of health or health officer, (if such board or officer there be,) and from the mayor or other head of the municipal government of the city or town, or city and county, a permit in writing so to remove or transport such body or remains in and through such streets and highways.

"Sec. 2. Permits to disinter or exhume the bodies or remains of deceased persons, as in the last section, may be granted, provided the person applying therefor shall produce a certificate from the coroner, the physician who attended such deceased person, or other physician in good standing cognizant of the facts, which certificate shall state the cause of death or disease of which the person died, and also the age and sex of such deceased; and provided, further, that the body or remains of deceased shall be enclosed in a metallic case or coffin, sealed in such manner as to prevent, as far as practicable, any noxious or offensive odor or effluvia escaping therefrom, and that such case or coffin contains the body or remains of but one person, except where infant children of the same parent or parents, or parent and children are contained in such case or coffin. And the permit shall contain the above conditions, and the words, 'Permit to remove and transport the body of ——, age ——, sex——;' and the name, age, and sex shall be written therein. The officer of the municipal government of the city or town, or city and county, granting such permit, shall require to be paid for each permit the sum of $10, to be kept as a separate fund by the treasurer, and which shall be used in defraying expenses of and in respect to such permits, and for the inspection of the metallic cases, coffins, and enclosing boxes herein required; and an account of such moneys shall be embraced in the accounts and statements of the treasurer having the custody thereof.

"Sec. 3. Any person or persons who shall disinter, exhume, or remove, or cause to be disinterred, exhumed, or removed

from a grave, vault, or other receptacle or burial place, the body or remains of a deceased person, without a permit therefor, shall be guilty of a misdemeanor, and be punished by fine not less than $50 nor more than $500, or by imprisonment in the county jail for not less than thirty days nor more than six months, or by both such fine and imprisonment. Nor shall it be lawful to receive such body, bones, or remains, on any vehicle, car, barge, boat, ship, steamship, steamboat, or vessel, for transportation in or from this state, unless the permit to transport the same is first received and is retained in evidence by the owner, driver, agent, superintendent, or master of the vehicle, car, or vessel.

"Sec. 4. Any person or persons who shall move or transport, or cause to be moved or transported, on or through the streets or highways of any city or town, or city and county, of this state, the body or remains of a deceased person which shall have been disinterred or exhumed, without a permit as described in section 2 of this act, shall be guilty of a misdemeanor, and be punishable as provided in section 3 of this act.

"Sec. 6. Nothing in this act contained shall be taken to apply to the removal of the remains of deceased persons from one place of interment to another cemetery or place of interment within the same county; provided, that no permit shall be issued for the disinterment or removal of any body, unless such body has been buried for two years." Stat. 1877–8, 1050.

The petitioner, Wong Yung Quy, is, and Wong Wai Toon was, in his life-time, a subject of the emperor of China, of the Mongolian race, residing in the United States. Wong Wai Toon died in January, 1876, and was buried in Laurel Hill Cemetery, a public cemetery of the city and county of San Francisco. In October, 1879, petitioner, a relative of the deceased, having complied with all the provisions of said act, except the payment of $10 required by said act to be paid for an exhumation and removal permit, demanded from the proper authorities permission to remove the remains of said

Wong Wai Toon from said cemetery, and ship them to China. Refusal having been made on the ground of the non-payment of said fee of $10 required to be paid by said act, the petitioner proceeded to disinter and remove said remains without a permit, and was arrested in the act, tried and convicted for the offence created by said statute in the court having jurisdiction, and sentenced to pay a fine of $50, or, in default of such payment, to imprisonment in the city and county jail for a period of twenty-five days. Failing to pay the fine, and being imprisoned in pursuance of the judgment, he obtained a writ of *habeas corpus;* and he now asks to be discharged on the ground that the provision of said act, requiring the payment of said fee for a permit, violates the treaty with China, known as the Burlingame treaty, and the constitution of the United States, and is therefore void. All the other provisions of the act having been complied with, the only question is as to the power of the legislature to require the petitioner to take out a permit at a cost of $10 as a condition of disinterment and removal of the remains of his relative from their place of burial.

The first point made is that the act, in the requirement in question, violates subdivision 3 of § 8, art. 1, of the national constitution, which provides that "congress shall have power to regulate commerce with foreign nations." We are unable to perceive any violation of this provision of the constitution, under the broadest construction claimed by petitioner for the term "commerce," even if it includes the transportation of the remains of aliens to their own country for final sepulture. There is no reference to aliens or to any extra-territorial act of any kind anywhere in the statute, except in the last clause of section 3, which is a wholly independent and different provision from that under consideration, creating an additional offence, and might be wholly omitted without affecting the remainder of the act. It is not necessary now to consider the question of the validity of that provision. The act deals with matters wholly within the state—within its territory— with the remains of parties who have lived and died within its jurisdiction, and which have been buried and which still

remain buried in its soil; and professedly and apparently for sanitary purposes. The statute knows nothing of the objects or motives of the exhumation, except as provided in section 6, that the act shall not apply to removals from one place of interment to another in the same county. This exception is doubtless made for those common cases wherein no vault or burial place has been provided for the deceased during life, and the remains are temporarily deposited in a public receiving vault, or the vault or grounds of some friend, till the surviving friends can provide for a place of final sepulture. These removals are ordinarily from one place of burial to another in the same or an adjacent cemetery, where there are several cemeteries lying near each other, as in San Francisco, and therefore not so fully within the reason upon which the act is founded. The statute deals with the local inter-territorial fact of burial and exhumation, without regard, in other respects than that stated, to motive or intention, race or nation, citizenship or alienage, future domestic or foreign sepulture.

The matter of the burial and exhumation of the dead, with a view to sanitary objects, has in all times and among all civilized nations been regarded as a proper subject of local regulation. It is founded upon the law of self-protection. The fact that in many or even most instances the object of disinterment is to send the remains abroad, cannot affect the question. The local sanitary considerations must be the same, whatever the purpose of exhumation and transportation through the streets of a city. The fact that the Chinese exhume and transport to their own country the remains of all or nearly all their dead, (amounting to more than ninety per cent. of all such removals,) while other aliens and citizens comparatively but rarely perform these acts, only shows that this generality of practice requires more rigid regulations and more careful scrutiny, in order to guard against infections and other sanitary inconveniences, that would otherwise be required. In *Secor's Case, Pratt,* J., says: "A proper respect for the memory of the dead, a regard for the tender sensibilties of the living, *and a due preservation of the public health,*

require that the corpses *should not be disinterred or transported from place to place*, except under extreme circumstances of exigency." 18 Alb. Law Jour. 488; 31 Legal Int. 268. The exposure of unburied human remains, or neglect to inter the same by the person on whom the duty is cast, is a misdemeanor at common law. See *Rex* v. *Stewart*, 12 Ad. & E. 773; *Chapple* v. *Cooper*, 13 Mes. & Wels. 252; *Ambrose* v. *Kerrison*, 10 Com. B. 776; *Jenkins* v. *Tucker*, 1 H. Black. 394; Willes, 536. And this is doubtless so, in part, at least, upon sanitary considerations generally recognized among enlightened nations.

We see nothing in the language of the act, in the surrounding circumstances, or in the nature of the subject-matter upon which the statute operates, to justify us in holding that the object of the legislature was to impose burdens on the commerce or intercourse between this country and China, rather than to provide wholesome sanitary regulations for the protection of our people. The statute is general, and operates wholly upon matters within the territoral jurisdiction of the state, and without discrimination as to remains to be removed to any considerable distance, whether within or without the state, and is within the principle of the case *In re Rudolph*, recently decided in the United States circuit court for Nevada, upon drummers' licenses. 10 Cent. Law Jour. 224; 2 FED. REP. 65. The exhumation and removal of the dead is not a matter of public indifference, harmless in itself, like the style of wearing the hair, as in the *Queue Case*; but it affects the public health, and its regulation is, like the regulation of slaughter-houses and other noxious pursuits, strictly within the police powers of the state. See *Ex parte Shrader*, 33 Cal. 286; *Slaughter-House Cases*, 16 Wall. 36.

In *Gibbons* vs. *Ogden*, 9 Wheat. 203, Mr. Chief Justice Marshall says: "But the inspection laws are said to be regulations of commerce, and are certainly recognized in the constitution as being passed in the exercise of a power remaining with the states. * * * The object of inspection laws is to improve the quality of articles produced by the

labor of a country; to fit them for exportation; or it may be for domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose. They form a portion of that immense mass of legislation which embraces everything within the territory of a state not surrendered to a general government, all of which can be most advantageously exercised by the states themselves. *Inspection laws, quarantine laws, health laws of every description,* as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, etc., are component parts of this mass."

If, then, as claimed, the transportation of the remains of deceased persons to China is a part of foreign commerce, these supervising and inspection laws "act upon the subject before it becomes an article of foreign commerce," and while the remains are being "prepared for that purpose." They simply provide that the preparations of the remains for foreign transportation, while still within the state and under its jurisdiction, shall be made in *such a manner* as not to be detrimental to the public health.

The principles relating to sanitary laws recognized in *City of New York* v. *Miln,* 11 Pet. 102; *Thorpe* v. *R. & B. R. Co.* 27 Vt. 140; *The Passenger Cases,* 7 How. 283; *Railroad Co.* v. *Huson,* 95 U. S. 471, and numerous other cases, are broad enough to cover the provisions in question. In these respects this case differs materially from the *Queue Case,* reported in 5 Sawyer, 553, and is more like the case arising under the cubic air statute, which we held to be constitutional. It being within the constitutional power to regulate the disinterment and removal of the dead, and to provide officers to scrutinize and supervise the operation in order to secure a conformity to the laws, we see no reason why a fee cannot be charged to and collected from those who desire to exercise the privilege, to defray the expenses of the inspection and supervision. The fee is charged under the law, not for the transportation or for the privilege of carrying the remains out of the country, but to pay the expenses of super-

vising their disinterment and due preparation for passing through the territory of the state, and through the streets of populous cities, either to other parts of the state or elsewhere, without endangering the health of the people.

For similar reasons the provision in question does not violate subdivision 2 of section 10, article 1, of the constitution, which provides that "no state shall, without the consent of congress, levy any imposts or duties on imports or exports, *except what is absolutely necessary for its inspection laws.*" The case also seems to be within the terms of this exception. Besides, the remains of deceased persons are not "exports" within the meaning of the term as used in the constitution. The term refers only to those things which are property. There is no property in any just sense in the dead body of a human being. 18 Alb. L. Jour. 487; 17 Alb. L. Jour. 258; *Pierce* v. *Pro. of Swan Point Cemetery*, 14 Am. Rep. 667; 10 R. I. 227, and cases cited. There is no impost or duty on exports in any proper sense, or in the sense of the constitution. This provision of the constitution was intended to prevent discrimination in matters of trade.

There is no violation of the fourteenth amendment to the national constitution. There is no discrimination against or in favor of any class of residents. It operates upon aliens of all nationalities and upon all citizens alike. It applies to all cases of remains to be removed beyond the boundaries of the county, whether to foreign countries, to other states, or to other parts of this state. And there are no restrictions upon disinterments and removals of Chinese dead to other places within the same county for burial not applicable to citizens and all other aliens. It may be that the large number of Chinese removals suggested the necessity for stringent supervision; but we see no reason to suppose that the act was not intended to operate upon all within its terms; and the testimony shows—if it is admissible to look at the testimony—that it is, in fact, enforced against all alike. But, whether enforced or not, the subject-matter, as we have seen, is a proper one for regulation; and if the act is not enforced upon all alike, there is a gross neglect of duty on the part of

those appointed for this purpose under the law. If the provisions of the act affect a larger number of Chinese than of any other class, it is not on account of any discriminations made by the law, but only because under their customs there is a much larger number of disinterments and removals by them than by any others. *In re Rudolph, supra,* and cases cited.

There is nothing in the provision in question in conflict with article 4 of the Burlingame treaty, which provides that "Chinese subjects of the United States shall enjoy entire liberty of conscience, and shall be free from all disabilities or persecutions on account of their religious faith or worship." Conceding that the religious sentiment of the Chinese requires that they shall remove the remains of their deceased friends to China for final burial, there is nothing in the provision forbidding or unduly obstructing the performance of that rite or religious duty, and nothing that does not equally apply to other aliens and citizens. It is only provided that, in the performance of that duty, proper precautions shall be taken not to endanger the health of the people among whom they have elected to live, and have died and once been buried. The fee established is only to liquidate the portion of expense of supervision and inspection imposed upon the public resulting from their custom; and, like the other expenses of disinterment and removal, which the surviving friends voluntarily incur, is necessarily incident to their peculiar practice. The customs of Chinese in this respect renders the supervision necessary and proper; and we can perceive no impropriety in charging them with the expense incident to it. The amount of $10 may seem large, but it is charged alike to all, and is not so large as to justify us in holding that it was manifestly intended to obstruct the performance of the duty; and we do not understand that the amount is regarded as objectionable if the charge is otherwise legal. Besides, it may well be questioned whether the treaty-making power would extend to the protection of practices, under the guise of religious sentiment, deleterious to the public health or morals, or to a subject-matter within the acknowledged police

power of the state. See *Reynolds* v. *United States,* 98 U. S. R. 145, with respect to religious belief as affected by the first amendment to the national constitution. But, under the view we take, it is unnecessary to consider the question now.

We are satisfied that the provisions of the act in question do not violate any provision of the national constitution or of the treaty with China, and that there is no ground for discharging the prisoner by this court.

Let the writ be discharged, and the prisoner remanded to the custody of the officer from whom he was taken.