**MINERSVILLE SCHOOL DIST. et al.**
**v. GOBITIS et al.**

No. 6862.

Circuit Court of Appeals, Third Circuit.

Nov. 10, 1939.

Writ of Certiorari Granted March 4, 1940.

See 60 S.Ct. 609, 84 L.Ed. ——.

Joseph W. Henderson, of Philadelphia, Pa., John B. McGurl, of Minersville, Pa., and George M. Brodhead, Jr., of Philadelphia, Pa., for appellants.

Harry M. McCaughey, of Philadelphia, Pa., and O. R. Moyle, of Brooklyn, N. Y., for appellee.

Arthur Garfield Hays, Jerome M. Britchey, and William G. Fennell, all of New York City, for American Civil Liberties Union, amicus curiae.

Before BIGGS and CLARK, Circuit Judges, and KALODNER, District Judge.

CLARK, Circuit Judge.

Eighteen big states[1] have seen fit to exert their power over a small number of little children[2] ("and forbid them not"). The method of exercise has sometimes been by their representatives in solemn conclave assembled and sometimes, as here, by an administrative agency (School Board). The matter of exercise is in that field where, above all, or so we had supposed, power must yield to principle. In other words, the area of action is within the aura of conscience.

The appellant School Board is entrusted by statute of Pennsylvania with the delicate, but surely not difficult, task of instructing the public school children under its control in "civics, including loyalty to the State and National Government". 24 Purdon's Pa.Stat.Ann., § 1551. To that end, as we assume it believed, the following regulation was promulgated on November 6, 1935:

"That the Superintendent of the Minersville Public Schools be required to demand that all teachers and pupils of said schools be required to salute the flag of our country as a part of the daily exercises. That refusal to salute the flag shall be regarded as an act of insubordination and shall be dealt with accordingly". Record, p. 6.

The appellees, a little girl of 13 and a little boy of 12, refused to salute the flag of "their country" on the appropriate occasion. They stood in respectful silence while the other children submitted to the "requirement" and they were "dealt with accordingly" by being expelled.

The reason for their refusal raises the constitutional issue of this appeal. They and their parents are members of a group (we avoid for the present more definite characterization) known as Russellites, or more colloquially, Earnest Bible Students,[3]

---

[1] Total population according to the latest census circa 38,000,000.

[2] According to the latest casualty lists circa 120.

[3] " * * * I consider them quacks * * * I dissolve the 'Earnest Bible Students' in Germany; their property I dedicate to the people's welfare; I will have all their literature confiscated." Pronouncement of A. Hitler, April 4, 1935.

or Jehovah's Witnesses. The defendant School Board admits that this group "sincerely and honestly believe that the act of saluting a flag contravenes the law of God" in that it constitutes a bowing down to a graven image.

The so-called flag salute statute (or regulation) first appeared in Kansas in 1907. The idea, without benefit of sanctions, seems to have originated with an employee of the magazine, The Youth's Companion. It was first put in practice at the National Public School celebration on October 21, 1892, The Youth's Companion Flag Pledge pamphlet. As with its related predecessor the teacher's oath (Nevada, 1866), the voluntary character of the ceremonial act soon disappeared into law and litigation, Oaths of Loyalty for Teachers pamphlet of the American Federation of Teachers, Chicago, Illinois. There is some current indication of a reversal in the trend of public opinion at least. Those who attended the training camps of World War No. 1 will remember our staff of life, the manuals of Colonel Moss. That distinguished officer, now retired, has also written extensively on the American flag. In his latest book, we find him taking a secular position remarkably like that of the plaintiff-appellees. He says:

"Another form that false patriotism frequently takes is so-called 'Flag-worship' —blind and excessive adulation of the Flag as an emblem or image,—superpunctiliousness and meticulosity in displaying and saluting the Flag—without intelligent and sincere understanding and appreciation of the ideals and institutions it symbolizes. This, of course, is but a form of idolatry —a sort of 'glorified idolatry', so to speak. When patriotism assumes this form it is nonsensical and makes the 'patriot' ridiculous". Chap. 14, Patriotism of the Flag, Moss, The Flag of the United States, Its History and Symbolism, pp. 85–86.

So also, Mr. Laurens M. Hamilton, a direct descendant of Alexander Hamilton, president of the New York Chapter of the Sons of the American Revolution (an organization never criticized for its lack of patriotism), told the Daughters of the American Revolution at the forty-second annual meeting of their Washington Heights Chapter:

"Laws cannot take the place of feeling. We must beware of legislation such as that forcing people to salute the flag. We cannot make people salute, we cannot force them to or command them to. What we can do is to make them want to salute it". The New York World Telegram, April 14, 1939.

This change in social sentiment appears to have reached the consciousness of at least one legislator. In Massachusetts this year Mr. Curtis introduced an amendment to the original act which expressly permits the excusing from the flag salute of pupils whose "parent or guardian has scruples, which he regards as religious, against such salute". Senate No. 449, March, 1939 (Mass.). In New Jersey, on the other hand, the opposite was true. The original act was "strengthened" to make a crime of influencing a "pupil * * * against the salute to the flag * * * by instruction printed or otherwise". P.L.N.J.1939, c. 65, sec. 1, N.J.S.A. 2:130–5.

These little children ("suffer them") are asking us to afford them the protection of the First Amendment (Bill of Rights[4]) to the Constitution and to permit them the "free exercise" of their "religion". That supplication raises, as we see it, two questions. First, do they bring themselves

---

[4] The actual amendment is the Fourteenth, U.S.C.A.Const., the action complained of being by a state. The Supreme Court has, however, reversed its original holding, Barron, use of Tiernan v. Baltimore, 1833, 7 Pet. 243, 8 L.Ed. 672, that the privileges of the Bill of Rights are not included within the term "due process". Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095; Burns v. United States, 274 U.S. 328, 47 S.Ct. 650, 71 L.Ed. 1077; Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484; Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; Shattuck, The True Meaning of the Term "Liberty" In Those Clauses in the Federal and State Constitutions Which Protect "Life, Liberty and Property", 4 Harvard Law Review, 365; Warren, The New "Liberty" Under the Fourteenth Amendment, 39 Harvard Law Review 431; Bill of Rights and Fourteenth Amendment, 31 Columbia Law Review 468, Constitutional Law; Liberty of Assembly Under the Fourteenth Amendment, 25 California Law Review 496; The Hague Injunction Proceedings, 48 Yale Law Journal 257.

within the meaning of the word "religion" as used in the Constitution; and second, is there any limitation on the adjective "free" in the constitutional phrase "free exercise"?

Appellant suggests that religion is an objective rather than a subjective matter. He goes on to argue that no one could conceivably appraise non-flag saluting in theological terms. In other words, he applies some sort of average reasonable man standard. We agree that the test is not without subjective limitations. The individual cannot claim any and all beliefs religious. Maybe he should be able to, but the fact is that the Constitution uses a certain word of art and does not employ the wider term "belief". A perfect illustration of this distinction is found in the cases of certain conscientious objectors under the Selective Draft Act of 1917, as amended, 40 Stat. 76, 534, 885, 955 (50 U.S. C.A. p. 165). As is known, most of those who objected to service in war offered religious scruples as an excuse. There were, however, a certain number whose claim for exemption was based solely on disbelief in war as an instrument of human policy. Their claims were disallowed and all of them were sentenced to long terms. See Case, Conscientious Objectors, 4 Ency. of Social Sciences p. 210; Second Report of the Provost Marshal General to the Secretary of War on the Operation of the Selective Service System, pp. 58-59; Third Assistant Secretary of War, Statement as to Treatment of Conscientious Objectors in the Army, September 28, 1918; Secretary of War, Statement as to Treatment of Conscientious Objectors in the Army, June 18, 1919.

As in most phases of the subject, there is not complete agreement on even a definition of religion, Hopkins, The History of Religions; Houf, What Religion Is and Does; Menzies, History of Religion, Rev. Ed.; Dewey, A Common Faith. Some interesting cases might (and may) arise under the broader conception, as for instance anything within the comprehensive term sacred, see Crawley, who gives the study of religion the wide scope of a comparative hierology. The Tree of Life, p. 209. Our courts have promulgated what has been referred to as a "minimum definition." Compare the language of a distinguished writer on the subject with that of Mr. Justice Field speaking for the Supreme Court of the United States.

The religious philosopher says:

"Religion is squaring human life with superhuman life. * * * What is common to all religions is belief in a superhuman power and an adjustment of human activities to the requirements of that power, such adjustment as may enable the individual believer to exist more happily". Hopkins, The History of Religions, p. 2.[5]

The legal philosopher says:

"The term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will". Davis v. Beason, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637.

By the same token the definition excludes any theory of sensible choice. If the requirement is present, the doctrinal views of the average man or the average official are wholly irrelevant. Professor Zollman speaks as follows:

" 'Were the administration of the great variety of religious charities with which our country so happily abounds, to depend upon the opinion of the judges, who from time to time succeed each other in the administration of justice, upon the question whether the doctrines intended to be upheld and inculcated by such charities, were consonant to the doctrines of the Bible; we should be entirely at sea, without helm or compass, in this land of unlimited religious toleration'. The law therefore does not presume 'to settle differences of creeds and confessions, or to say that any point of doctrine is too absurd to be believed' ". Religious Liberty in the Law, Part 2, 17 Michigan Law Review 456, 460-461. This last sentence is quoted from an early (1836) Pennsylvania case, Schriber v. Rapp, 5 Watts 351, 363, 30 Am.Dec. 327. See also, 3 Scott on Trusts, § 371.4.

The group to which the plaintiff-appellees belong comes plainly within the "most minimum" definition. It is the very thoroughness of their belief in the supernatural that has gotten them into trouble. Indeed, they qualify even under the more limited "well-recognized" of the Selective Service

---

[5] See also:
" * * * a propitiation or conciliation of powers superior to man which are believed to direct and control the course of nature and of human life". Frazer, The Golden Bough, 3d Ed., i. 222.

Act, 50 U.S.C.A. p. 165. Professor Elmer T. Clark lists them in his book, The Small Sects In America, and describes them as follows:

"The most vehement and spectacular, and also the most vigorous propagandists, of all the Adventists are the followers of the late 'Pastor' Charles Taze Russell, now known as the International Bible Students' Association, and sometimes called 'Jehovah's Witnesses'. The group is not a denomination, has no churches or ministry, and is not listed by the census; it is, indeed, bitter in its denunciation of all churches, Catholic and Protestant alike. The movement was created and controlled by Russell, who was an uneducated haberdasher of Allegheny, Pennsylvania, and at his death the mantle fell on one * * *

"Russell's exegesis differs from anything else that ever was on land or sea! He observes no canons of criticism and arrives at none of the conclusions reached by other students". Clark, The Small Sects in America, pp. 58-59.

See, also, Drake, Who Are Jehovah's Witnesses, 53 Christian Century, April 15, 1936, p. 567. One might note that the sect does not appear to practice the tolerance that it now asks for these young members of its flock. Incidentally, Professor Clark and the publication Religious Bodies, 1926, Vol. 2, Bureau of the Census, United States Department of Commerce, indicate how far from the average religious man's concept the beliefs of most of these so-called small sects depart.[6]

The noun religion is specific and has therefore what might be called historical and institutional limitations. The adjective free is general and its limitations, if any, must therefore be constitutional and politically scientific. And that is just what they are. We, this court, and finally the

United States Supreme Court, Committee for Industrial Organization v. Hague, D. C., 25 F.Supp. 127; Hague v. Committee for Industrial Organization, 3 Cir., 101 F.2d 774; Id., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, June 5, 1939, had recent occasion to consider the word in relation to speech and assembly. Many of the considerations there validated apply here and we need not repeat them. There are others that have even greater cogency. They can be summed up thus. A man may die for the right to express his opinion. He has died or suffered worse than death for the right to worship according to his conscience. That is implicit in the definitions of religion we have cited, in the long history of the struggle for religious liberty before the law, and in the utterances of our statesmen. That history and those sayings are undoubtedly taught in this very school at Minersville and are so well-known anyway that we shall only encumber this opinion with a few references and quotations.

The leading authority under the common law of England is, of course, Paterson. He devotes the second division of his work, Liberty of the Press, Speech and Public Worship, to an excellent account of the protracted struggle for toleration in Great Britain, Division of the Law Relating to the Security of Public Worship. Its successful continuation on the American continent is outlined in Crooker, The Winning of Religious Liberty, and the operation of the resultant constitutional mechanism which now governs and safeguards our manifold religious pursuits is carefully chronicled by Professor Zollman in his article, Religious Liberty in the Law, above cited. Three wise men of American public life have put into these words the concepts to which that mechanism is geared.[7]

---

6 Religious Bodies, 1926, Vol. 2: Seventh Day Adventist, p. 25; Apostolic Overcoming Holy Church of God, p. 58; Two-Seed-in-the-Spirit Predestinarian Baptists, p. 219; Dunkers, p. 226; Progressive Dunkers, p. 243; River Brethren, p. 286; United Zion's Children, p. 295; Christadelphians, p. 306; Christian Scientists, p. 354; Nazarenes, p. 392; Amana Society, p. 439; Shakers, p. 443; Anglicans, p. 452; Burning Bush, p. 569; Pillars of Fire, p. 584; Mormons (Latter Day Saints), p. 665; Mennonite Bodies, p. 842; Schwenkfelders, p. 1309.

7 These fellow countrymen of ours are only echoing the earlier words of the great 17th Century figures, the statesman and author, Sir William Temple (1628–1699), the philosopher, John Locke (1632–1704), and the 18th Century Cabinet member, Lord William Wyndham Grenville (1759–1834), all of whom embody the same glorious, as we think, conception in the following passages:

"Now the way to our future happiness has been perpetually disputed throughout the world; and must be left at last to the impressions made upon every man's belief and conscience, either by natural or supernatural means;"

"Religion is a subject on which I have ever been most scrupulously reserved. I have considered it as a matter between every man and his Maker, in which no other, and far less the public, had a right to intermeddle". Thomas Jefferson, Letter to Richard Rush in 1813.

"The love of religious liberty is a stronger sentiment than an attachment to civil or political freedom. That freedom which the conscience demands, and which men feel bound by their hopes of salvation to contend for, can hardly fail to be attained. Conscience in the cause of religion, and the worship of the Deity, prepares the mind to act and suffer beyond almost all other causes. History instructs us that this love of religious liberty, a compound sentiment in the breast of men, made up of the dearest sense of right and the highest conviction of duty, is able to look the sternest despotism in the face". Daniel Webster, Speech in Commemoration of the First Settlement of New England, Plymouth, 1820.

" * * * The battle for religious liberty has been fought and won with respect to religious beliefs and practices, which are not in conflict with good order, upon the very ground of the supremacy of conscience within its proper field. What that field is, under our system of government, presents in part a question of constitutional law, and also, in part, one of legislative policy in avoiding unnecessary clashes with the dictates of conscience. There is abundant room for enforcing the requisite authority of law as it is enacted and requires obedience, and for maintaining the conception of the supremacy of law as essential to orderly government, without demanding that either citizens or applicants for citizenship shall assume by oath an obligation to regard allegiance to God as subordinate to allegiance to civil power". Mr. Chief Justice Hughes dissenting in United States v. Macintosh, 283 U.S. 605, 634, 51 S.Ct. 570, 578, 75 L.Ed. 1302.

We observed and in fact held that free, as applied to speech and assembly, is not absolute and, with pundit Lippmann, wondered if anything is. 124 Atlantic Monthly, p. 616. We continue that wonder because here also an even greater urgency for freedom falls before reality. That reality lies in the need for society and so in the needs of society. It is rather interesting to note that in this case the proponents of religious freedom (the greater) are quite willing to concede this: whereas the proponents of free speech (the lesser) were quite unwilling to do so in the Hague case. There may be a distinction in the tendency of religious beliefs to go beyond the contemplations of Confucius into the practices of Brigham Young. This tendency piles up the precedents we discuss later. One might wonder, however, if the practice of rioting is not sometimes as bad as the practice of polygamy.

At any rate the concession that the maxim, "salus populi suprema lex" embraces the dictates of conscience was early made and by that great champion of religious liberty, Roger Williams of Rhode

---

which impression men may disguise or dissemble, but no man can resist. For belief is no more in man's power than his stature or his features; and he that tells me I must change my opinion for his, because it is the truer and the better—without other arguments that have to me the force of conviction—may as well tell me I must change my gray eyes for others like his that are black, because these are lovelier or more in esteem. * * * —sufficient and conceited men who talk much of right reason and mean always their own, and make their private imagination the measure of general truth." Temple, The Right of Private Judgment in Religion, p. 79.

"All the life and power of religion consists in the inward persuasion of the mind; and it is impossible for the understanding to be compelled to the belief of anything by the force of the magistrate's power. * * * Every man has the care of his own eternal happiness, the attainment whereof can neither be facilitated by another man's industry, nor the loss of it turn to another man's prejudice, nor the hope of it be forced from him by any external violence." Locke, Letters on Toleration, p. 111.

"It is the inveterate habit of intolerance to impute to the followers of every rival sect opinions which they disclaim, and to deduce from these tenets conclusions which they utterly deny. Justice and charity on the contrary, give to others the same liberty which we claim for ourselves—the liberty to form our opinions by the light of our own reason, to adopt, to investigate, to interpret for ourselves the tenets which we embrace, and to be credited in our exposition of them until our own practice shall have proved its insincerity." Lord Grenville, 22 Parl. Deb. 668.

Island. Likening the populace to a ship's company, he said:

"Liberty of conscience turns upon these two hinges: 1, that no one be forced to attend the ship's prayers or prevented from attending prayers of his own; 2, that if either refuse to obey the laws and orders of the vessel concerning its preservation and the common peace, or mutiny, or maintain that there should be no superior, that the commander in such case shall judge, resist, compel and punish such transgressor according to his deserts and merits". Roger Williams, Rhode Island Historical Society 4, p. 241.

The law today is as he admitted it must be. Professor Freund, the definitive authority on the subject of "police power" (jurist's argot for salus populi), sums it up:

"The constitutional guaranty of religious liberty covers above all the two cardinal points of worship and doctrine, the two forms in which the uncontrollable facts of faith and opinion find their principal outward expression; it includes secondarily also customs, practices and ceremonies, which even where they do not form directly a part of worship, are prescribed by religion. That this liberty does not altogether supersede the operation of the police power is recognized by the constitutional proviso found in many states that it shall not excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state, a proviso which may be implied where it is not expressed. * * * In the United States legislation punishing polygamy was upheld, though the Mormons conscientiously be-

lieved that their religion sanctioned and commended the practice. The Supreme Court emphasized the distinction between opinion and precept on the one hand, and practices affecting the social order on the other. Quoting with approval Jefferson's words 'that it is time enough for the rightful purposes of civil government to interfere when principals break out into overt acts against peace and good order'. It held that Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order". Freund, Police Power, p. 497.

And another distinguished writer gives his approval:

"Under the modern idea therefore, of intellectual and religious freedom, but at the same time of the paramount authority of the law, we generally and no doubt should generally, place a limit at the overt act and make its legality depend not on its motive but on its direct effect on the public weal. But the maxims 'sic utere tuum ut alieno non laedas', and 'salus populi suprema est lex' are as applicable in religious matters as in secular; and the state is and ever should be jealous of its public policy". Bruce, Religious Liberty in the United States, 74 Central Law Journal, 279, 285.[8]

We have then to balance the two intangibles salus and religio and determine to which arm of the scale the weight of our decision must be added. In doing so, under our system of case law, we are entitled, or rather constrained, to examine the precedents. Cardozo, The Nature Of The Judicial Process. All of these that

---

[8] This principle is expressly recognized in the constitutions of many states. So, for example, New York as early as 1777, subjected its constitutional guaranty of religious freedom to the proviso: " * * the liberty of conscience hereby declared shall not be construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of this State." N. Y. Constitution of 1777, Art. 38. A like limitation is to be found in the following: Arizona, Constitution of 1912, Art. 2, § 12; California, Constitution of 1879, Art. 1, § 4; Colorado, Constitution of 1876, Art. 2, § 4; Connecticut, Constitution of 1818, Art. 1, § 3; Florida, Constitution of 1885, D. R. § 5; Idaho, Constitution of 1890, Art. 1, § 4; Maryland, Constitution of 1867, D.R. Art. 36; Minnesota, Constitution of 1857, Art. 1, § 16; Mississippi, Constitution of 1890, Art. 3, § 18; Missouri, Constitution of 1875, Art. 2, § 5, Mo.St.Ann.; Montana, Constitution of 1889, Art. 3, § 4; Nevada, Constitution of 1864, Art. 1, § 4; New Hampshire, Constitution of 1784, Pt. 1, Art. 5; South Carolina, Constitution of 1868, Art. 1, § 9; Washington, Constitution of 1889, Art. 1, § 11; Wyoming, Constitution of 1889, Art. 1, § 18; see also, Massachusetts, Constitution of 1780, Pt. 1, Art. 2; Maine, Constitutions of 1819 and 1876, Art. 1, § 3; Oklahoma, Constitution of 1907, Art. 1, § 2, Okl.St.Ann. Compare, however, especially: " * * * Nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed." Constitution of Kentucky, Bill of Rights, § 5.

are cited in either brief and many more besides are collected in four standard sources. 11 Am.Jur. pp. 1100-1104; 16 C.J.S., Constitutional Law, § 206, pp. 599-603; American Digest System, Constitutional Law, ☞84; U.S.C.A., Constitution, Part 2, pp. 453–456; and see Association of American Law Schools Selected Essays on Constitutional Law, Vol. 2, pp. 1108–1175. Having examined these decided cases, we, again under our system, must search for a ratio decidendi, and then include or exclude our own particular set of facts.

■ As indicated by their decisions, our courts consider that the peace and good order of the community must prevail over conscience, (a) wherever its mental or physical health is affected, (b) wherever a violation of its sense of reverence makes a breach of the peace reasonably foreseeable, and (c) wherever the "defense of the realm" is imperiled. So in the broad category of physical and mental health, we have cases which defer the dictates of individual scruple to the exclusion of obscene literature from the mails, Knowles v. United States, 8 Cir., 170 F. 409; the use of obscence language, Delk v. Commonwealth, 166 Ky. 39, 178 S.W. 1129, L.R.A. 1916B, 1117, Ann.Cas.1917C, 884; the vaccination, Vonnegut v. Baun, 206 Ind. 172, 188 N.E. 677; and the physical examination of school children, Streich v. Board of Education, 34 S.D. 169, 147 N.W. 779, L.R.A.1915A, 632, Ann.Cas.1917A, 760; the physical examination of prospective brides and grooms, Peterson v. Widule, 157 Wis. 641, 147 N.W. 966, 52 L.R.A.,N.S., 778, Ann.Cas.1916B, 1040; the medical qualification of physicians (faith healing etc.), Fealy v. Birmingham, 15 Ala.App. 367, 73 So. 296; Post v. United States, 5 Cir., 135 F. 1022, 70 L.R.A. 989; People v. Pierson, 176 N.Y. 201, 68 N.E. 243, 63 L.R.A. 187, 98 Am.St.Rep. 666; State v. Verbon, 167 Wash. 140, 8 P.2d 1083; State v. Miller, 59 N.D. 286, 229 N.W. 569; the limitation of the amount of sacramental wine consumable under the Prohibition Act, Shapiro v. Lyle, D.C., 30 F.2d 971; the elimination of drug addiction, State v. Big Sheep, 75 Mont. 219, 243 P. 1067; the regulation of the exhumation of dead bodies, In re Wong Yung Quy, C.C., 2 F. 624, 632; the preservation of quiet, State v. White, 64 N.H. 48, 5 A. 828 (Salvation Army); City of Louisiana v. Bottoms, Mo.App., 300 S. W. 316; the suppression of mail frauds, New v. United States, 9 Cir., 245 F. 710, and kindred schemes, McMasters v. State, 21 Okl.Cr. 318, 207 P. 566, 29 A.L.R. 292 (Spiritualism—exorcisement of evil spirits); State v. Neitzel, 69 Wash. 567, 125 P. 939, 43 L.R.A.,N.S., 203, Ann.Cas.1914A, 899 (astrology).

Reverence is manifestly something deeper than law. The mere creation by fiat of a particular moral standard would not mean that its violation might reasonably be expected to arouse the passions productive of peace breaches. There are, however, certain "ethics" whether furnished with legal sanctions or not, that do plumb those reaches of our emotions. So in a monogamous civilization polygamy shocks and is forbidden, Reynolds v. United States, 98 U.S. 145, 163, 25 L.Ed. 244; Davis v. Beason, 133 U.S. 333, 342, 10 S.Ct. 299, 33 L.Ed. 637; Late Corporation of the Church of Jesus Christ of the Latter-Day Saints v. United States, 136 U.S. 1, 49, 10 S.Ct. 792, 34 L.Ed. 481, and see also, Warren, The Supreme Court in United States History p. 419. In a deistic civilization blasphemy shocks and is forbidden, State v. Mockus, 120 Me. 84, 113 A. 39, 14 A.L.R. 871; State v. Chandler, 2 Har.,Del., 553; Commonwealth v. Kneeland, 20 Pick. 206, 37 Mass. 206; People v. Ruggles, 8 Johns., N.Y., 290, 5 Am.Dec. 335; Updegraph v. Commonwealth, 11 Serg. & R., Pa., 394. In a Christian civilization disrespect for the Sabbath shocks and is forbidden, State v. Blair, 130 Kan. 863, 288 P. 729; Elliott v. State, 29 Ariz. 389, 242 P. 340, 46 A.L.R. 284; Shover v. State, 10 Ark. 259, 263; State v. Bott, 31 La.Ann. 663, 665, 33 Am.Rep. 224; Lindenmuller v. People, 33 Barb., N.Y., 548, 560; State v. Barnes, 22 N.D. 18, 132 N.W. 215, 37 L.R.A.,N.S., 114, Ann.Cas. 1913E, 93; Sparhawk v. Union Pass. Ry. Co., 54 Pa. 401, 406. It might be noted that the cases on these last seem to take an unduly sectarian position and further that the observance of Sunday is now generally placed on the basis of health. Petit v. State of Minnesota, 177 U.S. 164, 20 S.Ct. 666, 44 L.Ed. 716; Zollman, Religious Liberty in the Law, 17 Michigan Law Review 355, 373.

So far we have been talking more about salus in the sense of welfare among the citizens of a community. Clearly that presupposes a country and therefore presupposes until the millennium at least, its defense. Because, however, of what might be termed wishful thinking for that very

millennium, we find the conflict of conscience over "bearing arms" one of the saddest in this rather sad field. Professor Lecky, in his famous History of European Morals, traces the beginnings of this struggle. Vol. 2, p. 149. Public opinion, at least in the common law democracies, has taken cognizance of this conflict between scruple and safety. 5-6 Geo. V, ch. 104, secs. 2(1) and (3); Statutes of Canada, 7-8 Geo. V, ch. 19, sec. 11(1) f. From the inception of the Republic, religious objectors have been expressly or impliedly exempt from military service. Annals of Congress, Thirteenth Congress, Third. Session, Vol. 3, pp. 774, 775; Selective Draft Act, above cited; 32 U.S.C.A. § 3, and see United States v. Macintosh, 283 U.S. 605, 627, et seq., 51 S.Ct. 570, 75 L.Ed. 1302; Macintosh v. United States, 2 Cir., 42. F.2d 845; 26 Illinois Law Review 375; 30 Michigan Law Review 133; 11 Boston University Law Review 532; 80 University of Pennsylvania Law Review 275. These salutary laws made the constitutional issue of rare occurrence. Whenever it is presented, the decision, as it must, has been in favor of self-preservation. United States v. Macintosh, above cited, and see United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889; Hamilton v. Regents, etc., 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343.

We have not included in our classification of authorities those bearing on the issue of the case at bar. They are numerous, see Appendix 1, but they stand or fall by our own rightness as finally determined. We may say hardly a kind word about any of them appears in the. legal periodicals, see Appendix 2. Further, there are no binding precedents among them, see Appendix 3.

We have set forth the cases. What does an analysis show to be their ratio decidendi? Does compulsory flag saluting come within it? In making our analysis we must keep constantly in mind what we have on those scales which must come down on one side or the other. A framework of government presupposes its own welfare and our particular framework prescribes religious liberty. Under certain circumstances the two may be mutually exclusive. The necessity for any choice between conscience and country is tragic. It must be made. Salus is a material

conception. The injury is to the body and not the soul of the body politic. This eliminates the gentler aspects of love of country. A compulsory voting law, Merriam and Gosnell, Non-Voting, Its Causes and Methods of Control (1924), might well yield to scruples. On the other hand the state's existence has material foundations other than the martial one. Conscience could scarcely be added to the reasons for tax avoidance.[9] But until wars and rumors of wars cease to trouble, bearing arms must be the means of safety and as such means it must depend on the collective, however determined (cf. war referendum proposals), and not the individual, will ("my country right or wrong").

All but two classes of the cases are in negative form. In most of them, the religious objector is prohibited from propitiating the Deity in a certain way; he is not forced to commit a sacrilege. For instance, the Mormon is not damned for monogamy, the astrologist or spiritualist for personally consulting the stars or the spirits, or the Salvationists for using the soft pedal. The character of the field of health, of arms, and of the case at bar requires compulsion rather than prohibition. In the last named, the inoculation is against a spiritual indifference or disloyalty to country instead of a physical disease.

Cicero inversely describes the disease in his famous definition of patriotism. To that definition, we most humbly subscribe: "Cari sunt parentes, cari liberi, propinqui; familiares; sed omnes omnium caritates patria una complexa est; pro qua quis bonus dubitet mortem oppetere si ei sit profuturus?" Cicero, De Officiis, 1, 17.

A modern writer on ethics classifies this same abstraction under the head of Benevolence, in his discussion of Intuitionism. Sidgwick, The Methods of Ethics, p. 251. But is the disease so dangerous that it comes within the "clear and present" of the surely analogous free speech cases. Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed.. 561; Debs v. United States, 249 U.S. 211, 39 S.Ct. 252, 63 L.Ed. 566; Abrams v. United States, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173; Schaefer v. United States, 251 U.S. 466, 40 S.Ct. 259, 64 L.Ed. 360; Pierce v. United States, 252 U.S. 239, 40 S.Ct. 205, 64 L.Ed. 542;

---

9 Cf. "Render therefore unto Caesar the things which are Caesar's * * *." Matthew 22:21 (Mark 12:17; Luke 20:25).

O'Connell v. United States, 253 U.S. 142, 40 S.Ct. 444, 64 L.Ed. 827; Gilbert v. Minnesota, 254 U.S. 325, 41 S.Ct. 125, 65 L.Ed. 287; Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095; Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484; Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1337. Love of country in its relation to the armed forces thereof may have either a positive or a negative effect. It may prevent treachery and it may promote courage. There are plainly many more certain, if less pleasant, methods of providing against that extreme of disloyalty which is treachery. So, also, there are many equally certain, if less noble, methods of inciting to the martial zeal which is bravery on the field of battle. If all armies had to be volunteer, it might be otherwise. As it is, considerations of prestige in both its positive (promotions, decorations, etc.) and negative (fear of ridicule, etc.) facets operate and make the disease only para at most. After all, even mercenary troops used to win wars; a fortiori, is the remoteness of the sock-knitting and nursing abilities of grown-up girls. See United States v. Bland, 283 U. S. 636, 51 S.Ct. 569, 75 L.Ed. 1319; United States v. Schwimmer, above cited. We conclude that patriotism is an added advantage rather than an essential whose absence is dangerous in the clear and present sense.

An even more "clear, cogent and convincing," as the books say, argument follows from the type of vaccine used. That it must be reasonably effective is both a sensible and recognized canon of police power. Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann. Cas. 765. The punishment of polygamy, drum beating, blasphemy, and faith healing is indispensable to accomplish their prohibition. So, too, the prevention of epidemics requires vaccination. Is the same thing true of compulsory flag saluting? We can concede the general connection between the emblem and the virtue. In the words of a learned Japanese patriot:

" * * * Any nation which makes light of the flag must necessarily sink. Disrespect to the flag evinces a state policy pliable and submissive". M. Matsunami, The National Flag of Japan, p. 6.

Does the conception embrace the next step? The abstract problem postulated concerns the effectiveness of teaching love (of country) by force emanating from the would-be beloved (an administrative instrumentality of that country). We do not doubt that children can and have been forced to learn Latin or eat spinach and so eventually to love them. But this pedagogical victory has more often than not been won at the price of resentment towards the disciplinarian. In our particular circumstance, then, that resentment clashes with and cancels the very affection sought to be instilled. In recognition of this logical absurdity, we find students of educational psychology warning against overemphasis of the flag salute. Thus it is said: "The wisdom of exacting a salute to the American flag in contravention of the saluter's religious beliefs has been assailed by many editorials in newspapers throughout the land. There is a psychological futility in compelling a child to salute the flag when that impinges upon his or her religious tenets; such compulsion generates resentment, and is calculated to produce a precisely antithetical result to that which was planned by the authors of the flag-saluting ceremony. A salute to the flag under such circumstances is an affront to the principles for which the flag stands; to essay to engender love of country in this wise is a paradox too discordant to be suffered. Patriots cannot be moulded in the matrix of a legislative fiat, for patriotism is an imponderable." Hensley, The Constitutional Aspects of Compulsory Pledges of Allegiance and Salutes to the American Flag, The Lawyer, November, 1939, 5, 10.

"An objective appraisal of formulas frequently proposed reveals that many are concerned not with patriotism but with traditional or popular means of expressing it. One becomes loyal by swearing his allegiance or saluting the flag, singing the national anthem or celebrating a national holiday, venerating the makers of the organic law or worshipping those who now interpret it. * * *

"If American schools are to develop a creative citizenship, they must do more than train the next generation in matters which should be routine and voluntary. These means of expressing patriotism upon which some leaders would place emphasis are employed in dictatorships as well as in democracies. Loyalty in our republic must have its origin in concepts which are an integral part of the national philosophy itself", Campbell, In Quest of Patriotism,

The Nation's Schools, September, 1938, p. 42.

"* * * The noble sentiment of patriotism is worn threadbare not only in our movie houses but also in many schools. There are schools all over the United States in which the pupils have to go through the ceremony of pledging allegiance to the flag every school day. It would be hard to devise a means more effective for dulling patriotic sentiment than that. This routine repetition makes the flag-saluting ceremony perfunctory and so devoid of feeling; and once this feeling has been lost it is hard to recapture it for the 'high moments' of life.

"Furthermore, needless compulsory routine tends to set up in some minds an antagonistic attitude. This becomes associated with the ceremony itself and because it is automatic in response the person concerned can not later easily dissociate the two, even though he is intellectually convinced that the two need not go together". W. C. Ruediger, The George Washington University, 49 Schools and Society, February 25, 1939, p. 249.

Some sensing of which may have led the school superintendent of Minersville to admit in his testimony that flag saluting, although an appropriate one, is not the only method of teaching loyalty (R. p. 98). The salute, therefore, unlike the other exercises of the police power, negative and positive, which we have mentioned, is of at least doubtful efficacy and, as applied to appellees, plainly lacking in necessity. See Appendix 4.

A fourth and last distinction exists in the age of the target. In all but the medical cases the victims are adults. It is elementary to recognize disability of infants with respect to their contracts, torts, and to some extent crimes. 31 C.J. pp. 1058-1112. The cardinal ethical principle of this legal phenomenon is implicit in the very statutes by virtue of which the appellant performs its function. It is told:

"* * * No cruel experiment on any living creature shall be permitted in any public school of this Commonwealth". 24 Purdon's Pa.Stat.Ann. sec. 1554.

Here, nevertheless, that disability is not only not recognized, but is exploited. Children are faced with the alternative of conforming to their parents' view of religion or foregoing the privilege of education. That is true, of course, in the medical cases. There again, however, we are saved by the logic of the clear and present danger test. Little children with smallpox are as infectious as their elders.

■ To summarize our analysis: compulsory flag saluting is designed to better secure the state by inculcating in its youthful citizens a love of country that will incline their hearts and minds to its more willing defense. That particular compulsion happens to be abhorrent to the particular love of God of the little girl and boy now seeking our protection. One conception or the other must yield. Which is required by our Constitution? We think the material and not the spiritual.

Compulsion rather than protection should be sparingly exercised. Harm usually comes from doing rather than leaving undone, and refraining is generally not sacrilege. We do not find the essential relationship between infant patriotism and the martial spirit. That essence we have borrowed from the settled law of another and cognate part of this same provision of the Bill of Rights. A fortiori departure from a recently evolved ritualistic norm of patriotism is not clear and present assurance of future cowardice or treachery. And that is especially so, where compulsory adherence to that norm is neither logically consistent with, nor pedagogically indispensable to, the dissemination of courage or loyalty. Equally important, we think, is the School Board's mistake in the domain where they are not supposed to make mistakes. They misunderstand and therefore misapply a fundamental of education. Children, as well as "birds and animals", 24 Purdon's Pa. Stat.Ann. sec. 1551, are entitled to the benefits of humane treatment.

We conclude with two examples from the history of the "small sects" of Pennsylvania's early days. The state was colonized and founded by William Penn. He came to the new country because his refusal to subordinate religious scruples to educational coercion led to his expulsion from Oxford University in the old. Document by John Aubrey (now in the Bodleian Library).

George Washington, the almost universal character of whose wisdom always freshly surprises, a century later wrote a letter to the descendants of those whom William Penn brought with him. In it General Washington said:

"Government being, among other purposes, instituted to protect the persons

and consciences of men from oppression it certainly is the duty of rulers, not only to abstain from it themselves, but according to their stations to prevent it in others.

"I assure you very explicitly, that in my opinion the conscientious scruples of all men should be treated with great delicacy and tenderness; and it is my wish and desire, that the laws may always be as extensively accommodated to them, as a due regard to the protection and essential interests of the nation may justify and permit". Writings of George Washington (Sparks Ed. Vol. 12, pp. 168-169), Letter to the Religious Society Called Quakers, October, 1789.

The appellant School Board has failed to "treat the conscientious scruples" of all children with that "great delicacy and tenderness". We agree with the father of our country that they should and we concur with the learned District Court in saying that they must.

The decree of the District Court is affirmed.

### APPENDIX

1. Appellants' position is ostensibly sustained by Hering v. State Board of Education, 117 N.J.L. 455, 189 A. 629, affirmed per curiam, 118 N.J.L. 566, 194 A. 177, appeal dismissed 303 U.S. 624, 58 S.Ct. 752, 82 L.Ed. 1087; Nicholls v. Mayor and School Committee of Lynn, Mass., 7 N.E.2d 577, 110 A.L.R. 377; Leoles v. Landers, 184 Ga. 580, 192 S.E. 218, appeal dismissed 302 U.S. 656, 58 S.Ct. 364, 82 L.Ed. 507; Gabrielli v. Knickerbocker, Cal.App., 74 P.2d 290, reversed 12 Cal.2d 85, 82 P.2d 391, appeal dismissed and certiorari denied, 306 U.S. 621, 59 S.Ct. 786, 83 L.Ed. 1026; Johnson v. Town of Deerfield, D.C., 25 F.Supp. 918, affirmed 306 U.S. 621, 59 S.Ct. 791, 83 L.Ed. 1027; People v. Sandstrom, 279 N.Y. 523, 18 N.E.2d 840, and see Shinn v. Barrow, Tex. Civ.App., 121 S.W.2d 450.

We exclude from our citation the many adjudications dealing with compulsory Bible reading in public schools. These, though factually related to our circumstance, are in irreconcilable conflict with one another and seem in the last analysis to turn upon a nice construction of state constitutional provisions regarding primarily the establishment rather than the free exercise of religion. See 34 Michigan Law Review 1237; 28 Michigan Law Review 431; 16 Virginia Law Review 509.

2. Judicial condonation of the flag salute in our circumstance has been criticized in 51 Harvard Law Review 1418; 23 Minnesota Law Review 247; 27 Georgetown Law Journal 231; 18 Oregon Law Review 127; 23 Iowa Law Review 424; 2 University of Pittsburgh Law Review 206; 4 University of Pittsburgh Law Review 243; 86 University of Pennsylvania Law Review 431; 12 Temple Law Quarterly 513; 23 Cornell Law Quarterly 582; and see, Gardner and Post, The Constitutional Questions Raised by the Flag Salute and Teachers' Oath Acts in Massachusetts, 16 Boston University Law Review 802; Clark, The Limits of Free Expression, 73 United States Law Review, 392, 399. Compare 36 Michigan Law Review 465; 6 Kansas City Law Review 217. Many of these law notes give unstinted and, as we think, deserving praise to the opinions of the learned court below. Gobitis v. Minersville School District, D.C., 21 F.Supp. 581; Id., D.C., 24 F.Supp. 271.

3. Four cases enjoy the per curiam affirmance of the Supreme Court. Three of these, however, Hering v. State Board of Education, Leoles v. Landers, and Johnson v. Town of Deerfield, above cited, deal with a circumstance entirely distinct from the case at bar. In each of them, both the state legislature declared, and the highest state court affirmed, a policy of flag saluting. By reason of this legislative and judicial determination, the connection between an omission to salute the flag and the commission of an injury to the public weal, becomes legally and factually closer, Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, and see, Brown, Due Process of Law, Police Power and the Supreme Court, 40 Harvard Law Review 943. But here there is no such declaration or affirmance of policy. The legislature of Pennsylvania has gone no further than to prescribe the teaching of civics. The fourth case, Gabrielli v. Knickerbocker, above cited, involves as here, a regulation, but one which had been sustained by the highest court of California. However, the Supreme Court dismissed the appeal therefrom merely for want of jurisdiction under 28 U.S.C.A. § 344(a) and denied certiorari under 28 U.S.C.A. § 344(c). In this connection we observe that the jurisdictional issue at bar has been settled in favor of exercise. Hague v. Committee for Industrial Organization, 307 U.S.

496, 59 S.Ct. 954, 83 L.Ed. 1423, June 5, 1939, above cited.

Hamilton v. Regents (the land grant college case), 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343, often cited, is, we think, distinguishable. There a religious objector was expelled from a state university on his refusal to participate in military instruction (originally commanded by the Congress). The decision turned inter alia upon the fact that since the state did not draft students to attend the university it did not coerce the objector in the exercise of his religion. Cf. The Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. Here, of course, there is such coercion. The statutes call for compulsory attendance, 24 Purdon's Pa.Stat.Ann. sec. 1421, and the functioning of truant officers who have full police power to arrest without warrant any child who fails to attend or is incorrigible, insubordinate, or disorderly, 24 Purdon's Pa.Stat.Ann. sec. 1471. Thus if the offending child is too poor to purchase private education it may well end in reform school, 11 Purdon's Pa.Stat.Ann. sec. 243(4) (c), sec. 250(d), cf. Clark, The Limits of Free Expression, 73 United States Law Review 392, 399, et seq., and its parents in jail, 24 Purdon's Pa.Stat. Ann. sec. 1430, and see 2 University of Pittsburgh Law Review 206, above cited. Furthermore, under constitutions worded as in Pennsylvania, Purdon's Pa.Stat.Ann., Constitution, Art. 10, § 1, p. 420, a child's right to primary (school) as distinguished from secondary (college) education is capable of enforcement at law. State ex rel. Roberts v. Wilson, 221 Mo.App. 9, 297 S.W. 419; Bishop v. Houston Independent School Dist., Tex.Civ.App., 35 S.W.2d 465; Newman v. Schlarb, 184 Wash. 147, 50 P.2d 36; Valentine v. Independent School District, 191 Iowa 1100, 183 N.W. 434, People ex rel. Cisco v. School Board, 161 N.Y. 598, 56 N.E. 81, 48 L.R.A. 113.

4. The record before us sheds but little light upon the problems in educational psychology here discussed. Nor do the briefs direct us to any authorities on the subject. Compare Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551, 13 Ann.Cas. 957. To decide questions of reasonableness in the absence of undisputed factual proof or knowledge is of course open to criticism. As has been aptly observed:

"* * * these underlying questions of fact, which condition the constitutionality of the legislation, are at times questions on which the layman feels justified in forming his own opinion and in declining to yield it to that of the judge, at least when the judge bases his determination, not on evidence produced in the case before him, but on his general information, —the same foundation upon which the layman builds his conclusion. As an example, the layman may be quite ready to defer to the opinion of the court when the decision requires a definition of the legal significance of the phrase 'ex post facto law;' but when the court decides that a law limiting the hours that people may work in bakeshops has no substantial relation to the promotion of the public health, he is inclined to doubt the finality of this finding, since he knows of no particular reason for supposing that the judges are better able to decide such a question than other intelligent persons, unless their determination is based upon evidence produced, before them in the usual way carefully weighed and considered". Bikle, Judicial Determination of Questions of Fact Affecting the Constitutional Validity of Legislative Action, 38 Harvard Law Review 6, 7.

See, also, The Consideration of Facts in "Due Process" Cases, 30 Columbia Law Review 360 (comment). We feel, however, that this criticism cannot reach the instant case. The matter here can hardly be reduced to statistics. It is rather one of logical conjecture and comparison with the pattern of decided cases, based, furthermore, upon the learned trial judge's special finding of the fact of unreasonableness.